# UNITED STATES *v.* CANNELTON SEWER PIPE CO.

No. 513.  Argued May 19, 1960.—
Decided June 27, 1960.

*Ralph S. Spritzer* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Acting Assistant Attorney General Heffron, Melva M. Graney* and *James P. Turner.*

*Erwin N. Griswold* argued the cause for respondent. With him on the brief was *Howard P. Travis.*

*Robert E. Lee Hall* and *Richard L. Hirshberg* filed a brief for the National Coal Association, as *amicus curiae.*

Mr. Justice Clark delivered the opinion of the Court.

This income tax refund suit involves the statutory percentage depletion allowance to which respondent, an integrated miner-manufacturer of burnt clay products from fire clay and shale, is entitled under the Internal Revenue Code of 1939.[1]

The percentage granted by the statute is on respondent's "gross income from mining." It defines "mining" to include the "ordinary treatment processes normally applied by mine owners . . . to obtain the commercially marketable mineral product or products." Respondent claimed that its first "commercially marketable mineral product" is sewer pipe and other vitrified articles. Alternatively, it contended that depletion should be based on the price of 80 tons of ground fire clay and shale actually sold during the tax year in question. The District Court agreed with respondent's first claim. The Court of Appeals affirmed, holding that respondent could not profitably sell its raw fire clay and shale without processing it into finished products, and that its statutory percentage depletion was therefore properly based on its gross sales

---

[1] The applicable provisions of the Code are § 23 (m) and § 114 (b) (4). In general, they provide for a depletion allowance based on a percentage of "gross income from mining," which is specifically defined. See note 8, *infra.* The percentage permitted on shale is 5%, and on fire clay, 15%.

of the latter. 268 F. 2d 334. The Government contends that the product from which "gross income from mining" is computed is an industry-wide test and cannot be reduced to a particular operation that a taxpayer might find profitable. The Government further argues that, while the statute permits ordinary treatment processes normally applied by miners to the raw product of their mines to produce a commercially marketable mineral product, it does not embrace the fabrication of the mineral product into finished articles. In view of the importance of the question to taxpayers as well as to the Government, we granted certiorari. 361 U. S. 923. We disagree with respondent's contention that the issue is not presented by this record, and we therefore reach the merits. We have concluded that, under the mandate of the statute, respondent's "gross income from mining" under the findings here is the value of its raw fire clay and shale, after the application of the ordinary treatment processes normally applied by nonintegrated miners engaged in the recovery of those minerals.[2]

I.

During the tax year ending November 30, 1951, the respondent owned and operated an underground mine from which it produced fire clay and shale in proportions of 60% fire clay and 40% shale. It transported the raw mineral product by truck to its plant at Cannelton, Indiana, about one and one-half miles distant. There it processed and fabricated the fire clay and shale into vitrified sewer pipe, flue lining and related products. In this process, the clay and shale is first ground into a pulverized form about as fine as talcum powder. The

---

[2] The quantity of ground and bagged fire clay and shale actually sold is too negligible to furnish an appropriate basis for computing depletion.

powder is then mixed with water in a pug mill and becomes a plastic mass, which is formed by machines into the shape of the finished ware desired. The ware is then placed in dryers where heat of less than 212° is applied to remove all of the water. This process takes from 12 hours to 3 weeks, depending on the size of the ware. Thereafter the ware is vitrified in kilns at 2,200° Fahrenheit, requiring from 60 to 210 hours. It is then cooled, graded and either shipped or stored.

Not all clays and shales are suitable for respondent's operations. They must have plasticity, special drying qualities and be able to withstand high temperatures. Respondent's clay, known as Cannelton clay, is the deepest clay mined in Indiana and, respondent says, yields the best sewer pipe. Its cost of removing and delivering the same to its plant was $2.418 per ton in 1951. Respondent used some 38,473 tons of clay and shale in its operations that year and sold approximately 80 tons of ground fire clay and shale in bags at a price of $22.88 per ton. Net sales of its finished wares amounted to approximately one and a half million dollars.

In connection with its tax assessment for the year in question, respondent filed a document in which it stated that "we used as a basis for calculating the gross income from our mining operations of shale and fire clay the point in our manufacturing operations at which we first arrive with a commercially marketable product, which is ground fire clay. This product arrives after the raw mineral is crushed and granulated to such extent that by the addition of water it can be made into a mortar for use in laying or setting fire or refractory brick. This ground fire clay has a definite market and an ascertainable market value at any particular time and is the same product from which our end product, sewer tile, is made simply by the addition of water and the necessary baking process." In this return it based the value of the ground

fire clay at $22.81 per ton, the price for which it sold some 80 tons of that material in bags during 1951. At this figure the depletion allowance would have been slightly above $2 per ton. Thereafter respondent claimed error and asserted that its mineral product, rather than being commercially marketable when it reached the stage of ground fire clay, only became commercially marketable when it became a finished product, e. g., sewer pipe. On this basis, the depletion allowance on petitioner's gross income would be approximately $4 per ton, since the mineral would have a value of about $40 per ton. On the other hand, if the mineral it used in 1951 was valued at $1.60 to $1.90 per ton, the going price elsewhere in Indiana, the depletion allowance would be approximately 20¢ per ton.

The record shows and the District Court found that in 1951 there were substantial sales of raw fire clay and shale in Indiana, mostly in the vicinity of Brazil, about 140 miles from Cannelton. The average price there was $1.60 to $1.90 per ton for fire clay and $1 per ton for shale. Transportation costs from Brazil to Cannelton ran from $4.58 to $5.50 per ton. In Kentucky, across the river from respondent's plant, it appears that fire clay and shale of the same grade were mined and sold [3] before, dur-

---

[3] The evidence indicates that, for $50, Owensboro Sewer Pipe Company bought from L. R. Chapman five acres of ground under which the shale and clay deposits lay. Contemporaneously it made a contract with L. R. Chapman, Inc., to mine and deliver shale and fire clay from this tract to the Owensboro plant for $1.40 per ton. Chapman also testified that in addition he furnished shale and fire clay to other manufacturers in the same area in Kentucky. The arrangements varied. Some were similar to the Owensboro agreement, while others were leases on a royalty basis with a contemporaneous agreement to mine and deliver the clay at a set price. The exact year or years are not clear, but appear to have been between 1949 and 1956. Respondent began using shale and fire clay from the same source by lease arrangement in 1957. The reason for lease arrangements and

ing and subsequent to 1951. In fact, since 1957 respondent has secured all of its mineral requirements from this source on a lease basis under which the lessor mines and delivers the raw material to its plant. The exact cost is not shown, but the haul in 1957 from pit to plant, including the ferry crossing, was some seven miles.

## II.

We have carefully studied the legislative history of the depletion allowance, including the voluminous materials furnished by the parties, not only in their briefs but in the exhaustive appendices and the record.[4] We shall not burden this opinion with its repetition.

In summary, mineral depletion for tax purposes is an allowance from income for the exhaustion of capital assets. *Anderson* v. *Helvering,* 310 U. S. 404 (1940). In addition, it is based on the belief that its allowance encourages extensive exploration and increasing discoveries of additional minerals to the benefit of the economy and strength of the Nation. We are not concerned with the validity of this theory or with the statutory policy. Our sole function is application of the congressional mandate. A study of the materials indicates that percentage depletion first came into the tax structure in 1926, when the Congress granted it to oil and gas producers. The percentage allowed was based on "gross income from the property," which was described as "the gross receipts from the sale of oil and gas as it is delivered from the property." Preliminary Report, Joint Committee on Internal Revenue Taxation, Vol. I, Part 2 (1927). The report continued that, as to the integrated

---

paper transfer of title is not shown. However, Chapman testified that the manufacturers "didn't seem to want to do the prospecting or the sampling until they were sure they could get either a lease or a deed."

[4] The briefs cover 294 pages and the appendices an additional 685, not including 10 charts. The record is 276 pages.

operator, "the gross income from the property must be computed from the production and posted price of oil, as the gross receipts from a refined and transported product can not be used in determining the income as relating to an individual tract or lease." The Treasury Regulations confirmed this understanding. Treas. Reg. 74 (1929 ed.), Arts. 221 (i), 241.

Thereafter, in 1932, percentage depletion was extended to metal mines, coal, and sulphur. The mining engineer of the Joint Committee, Alex. R. Shepherd, urged in a report to the Congress [5] that depletion for metal mines be computed, as in the oil and gas industry, on a percentage-of-income basis, and the Revenue Act of 1932 was so drawn. The Shepherd Report pointed out that the percentage basis for oil and gas depletion had been in force for over a year and had "functioned satisfactorily both from economical and administrative viewpoints and without loss of revenue." It added that "careful study of this method as applied to metal mines indicates that the same results will be attained in practice as in the case of oil and gas," but that, because of varied practices in the mining industry, it would be necessary to determine "the point in accounting at which" gross income from the property mined could be calculated. It recommended that "it is logical to peg 'gross income from the property' f. o. b. cars at mine," i. e., net smelter returns, recognizing that processing beyond this point should not be included in calculating "gross income from the property." While as to certain metals, viz., gold, silver, or copper, the report suggested that gross income should be based on receipts from "the sale of the crude, partially beneficiated or refined" product, this was but to make

[5] Preliminary Report on Depletion, Staff Reports to the Joint Committee on Internal Revenue Taxation (1930), Appendix XXXI (Shepherd Report).

provision for the specific operations of miners in those metals.   In this regard the report also proposed that the depletion base "in the case of all other metals, coal and oil and gas, [should be] the competitive market receipts, or its equivalent, received from the sale of the crude products, or concentrates on an f. o. b. mine, mill, or well basis."

The Congress in fashioning the 1932 Act took into account these recommendations.   It incorporated a provision in the Act allowing percentage depletion for coal and metal mines and sulphur, based on the "gross income from the property."   § 114 (b)(4), Revenue Act of 1932, 47 Stat. 169.   On the following February 10, 1933, the Treasury issued its Regulations 77, which defined "gross income from the property" as "the amount for which the taxpayer sells (a) the crude mineral product of the property or (b) the product derived therefrom, not to exceed in the case of (a) the representative market or field price . . . or in the case of (b) the representative market or field price . . . of a product of the kind and grade from which the product sold was derived, before the application of any processes . . . with the exception of those listed . . . ."   Treas. Reg. 77, Art. 221 (g).   These exceptions listed processes normally in use in the mining industry for preparing the mineral as a marketable shipping product.   The regulation was of unquestioned validity and, in 1943, at the instance of the industry, the Congress substantially embodied it into the statute itself, 58 Stat. 21, 44, including the basic definition of the term "gross income from the property." [6]   Since that time the

---

[6] See, *e. g.*, Hearings before Senate Committee on Finance on H. R. 3687, 78th Cong., 1st Sess. 528; S. Rep. No. 627, 78th Cong., 1st Sess. 23–24; Hearings before House Committee on Ways and Means on Revenue Revisions, 80th Cong., 1st Sess., part 3, at 1857; Hearings before Senate Committee on Finance on H. R. 8920, 81st Cong., 2d Sess. 771; S. Rep. No. 2375, 81st Cong., 2d Sess. 53–54.

section on percentage depletion—§ 114 (b)(4)(B) of the 1939 Code—has remained basically the same.[7] Additional minerals have been added from time to time—shale and fire clay in 1951—until practically all minerals are included.

As now enacted, the section provides that "mining" includes "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products," plus transportation from the place of extraction to the "plants or mills in which the ordinary treatment processes are applied thereto," not exceeding 50 miles.[8] It then defines "ordinary treatment processes"

[7] The present statute, § 613 of the Internal Revenue Code of 1954, is essentially unchanged.

[8] Internal Revenue Code of 1939, § 114 (b) (4) (B):
*"Definition of Gross Income from Property.*—As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. The term 'ordinary treatment processes,' as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily

by setting out specifically in four categories those covering some 17 named minerals. Fire clay and shale are not within these specific enumerations. The Government, however, contends that they should come within clause (iii) of the section, which provides that, "in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, *and minerals which are customarily sold in the form of a crude mineral product*—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment . . ." are included in "ordinary treatment processes." (Italics added.) Clause (iv) lists specific metals such as lead, zinc, copper, etc., "and ores which are not customarily sold in the form of crude mineral product," and specifically excludes from the permissible processes certain ones used in connection with these metals. To recapitulate, the section contains four categories of "ordinary treatment processes": the first enumerating those permissible as to the mining of coal; the second, as to sulphur; the third, as to minerals customarily sold in the form of the crude mineral product; and the fourth, as to those ores not customarily so sold. We note that the Congress even states the steps in each permissible process, and in addition specifically declares some processes not to be "ordinary treatment" ones, *viz.,* "electrolytic deposition, roasting, thermal or electric smelting, or refining." Furthermore, none of the permissible processes

sold in the form of crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 450 and 453." 26 U. S. C. (1952 ed.) § 114.

destroy the physical or chemical identity of the minerals or permit them to be transformed into new products.

From this legislative history, we conclude that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles.

## III.

The findings are that three-fifths of the fire clay produced in Indiana in 1951 was sold in its raw state. This indicates a substantial market for the raw mineral. In addition, large sales of raw fire clay and shale were made across the river in Kentucky. This indicates that fire clay and shale were "commercially marketable" in their raw state unless that phrase also implies marketability at a profit. We believe it does not. Proof of these sales is significant not because it reveals an ability to sell profitably—which the respondent could not do—but because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the "mining" state on which the depletion principle operates. It would be strange, indeed, to ascribe to the Congress an intent to permit each miner to adopt processes peculiar to his individual operation. Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high-cost mine operator. The value of respondent's vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals.

Respondent insists that its miner-manufacturer status makes some difference. We think not. It is true that the

integrated miners in Indiana outnumbered the nonintegrated ones. But in each of the three basic percentage depletion Acts the Congress indicated that integrated operators should not receive preferred treatment. Furthermore, in Regulations 77, discussed above, the Treasury specifically provided that depletion was allowable only on the crude mineral product. And, as we have said, this regulation was substantially enacted into the 1943 Act. We need not tarry to deal with any differences which are said to have existed in administrative interpretation, for here we have authoritative congressional action itself. Ever since the first percentage depletion statute, the cut-off point where "gross income from mining" stopped has been the same, i. e., where the ordinary miner shipped the product of his mine. Respondent's formula would not only give it a preference over the ordinary nonintegrated miner, but also would grant it a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned.

## IV.

We now reach what "ordinary treatment processes" are available to respondent under the statute. As the principal industry witness put it at hearings before the Congress: "Obviously it was not the intent of Congress that those processes which would take your products and make them into different products having very different uses should be considered, as the basis of depletion." [9] But respondent says that the processes it uses

---

[9] Robert M. Searls, Attorney, San Francisco, Hearings before the Senate Special Committee on the Investigation of Silver, 77th Cong., 2d Sess., p. 764.

are the ordinary ones applied in the industry. As to the miner-manufacturer, that is true. But they are not the "ordinary" normal ones applied by the nonintegrated miner. It was he whom the Congress made the object of the allowance. The fabrication processes used by respondent in manufacturing sewer pipe would not be employed by the run-of-the-mill miner—only an integrated miner-manufacturer would have occasion to use them.

Respondent further contends, however, that it must utilize these processes in order to obtain a "commercially marketable mineral product or products." It points out that its underground method of mining prevents it from selling its raw fire clay and shale. This position leads to the conclusion that respondent's mineral product has no value to it in the ground. If this be true, then there could be no depletion. One cannot deplete nothing. On the other hand, respondent alleges that its minerals yield "the best sewer pipe which is made in Indiana." If this be true, then respondent's problem is one purely of cost of recovery, an item which, as we have said, has nothing to do with value in the depletion formulae. Depletion, as we read the legislative history, was designed not to recompense for costs of recovery but for exhaustion of mineral assets alone. If it were extended as respondent asks, the miner-manufacturer would enjoy, in addition to a depletion allowance on his minerals, a similar allowance on his manufacturing costs, including depreciation on his manufacturing plant, machinery and facilities. Nor do we read the use by the Congress of the plural word "products" in the "commercially marketable" phrase as indicating that normal processing techniques might include the fabrication of different products from the same mineral. We believe that the Congress was only recognizing that in mining operations often more than one mineral product was recovered in its raw state.

In view of the finding that substantial quantities—in fact, the majority—of the tonnage production of fire clay and shale were sold in their raw state, we believe that respondent's mining activity during the year in question would come under clause (iii) of the section here involved. That clause includes "minerals which are customarily sold in the form of a crude mineral product." We believe that the Congress intended integrated mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for fabrication. It would, of course, be permissible for such an operator to calculate his "gross income from mining" at the point where "ordinary" miners—not integrated—disposed of their product. All processes used by the nonintegrated miner before shipping the raw fire clay and shale would under such a formula be available to the integrated miner-manufacturer to the same extent but no more.

Nor do we believe that the District Court and Court of Appeals cases involving percentage depletion and cited by respondent are apposite here.[10] We do not, however, indicate any approval of their holdings. It is sufficient to say that on their facts they are all distinguishable.

[10] Respondent's cases are based on *United States* v. *Cherokee Brick & Tile Co.*, 218 F. 2d 424 (adhered to in *United States* v. *Merry Bros. Brick & Tile Co.*, 242 F. 2d 708), which went off on factual concessions not present here. They have been pyramided into a statistically imposing number of cases, predicated upon one another. Close analysis indicates that they either go off on concessions or findings not present here, or deal with controversies over particular treatment processes claimed as "ordinary" in the industry involved. For our purposes, we need not reach the question of whether in those cases the minerals in place had any "value" to be depleted. Other than the decision here under review, only two of the Court of Appeals cases cited by respondent, both from the same Circuit (*Commissioner* v. *Iowa Limestone Co.*, 269 F. 2d 398; *Bookwalter* v. *Centropolis Crusher Co.*, 272 F. 2d 391), adopt the profitability test, which we find unacceptable.

In view of these considerations, neither of respondent's alternate claims for depletion allowance is appropriate. The judgment of the Court of Appeals is therefore reversed, and the cause remanded for further proceedings in conformity with this opinion.

*It is so ordered.*

Mr. Justice Harlan, concurring in the result.

In joining the judgment in this case I shall refer only to one matter which, among the voluminous data presented by the parties, is for me by far the most telling in favor of the Government's position.

Treasury Regulation 77, promulgated in 1933 under the Revenue Act of 1932 (47 Stat. 169), defined the basic term "gross income from the property" contained in § 114 (b)(4) of the 1932 Act and carried forward in its successors. Art. 221 (g). It concededly supports, by its express terms (see *ante,* p. 83), the position of the Government in the present case. In my opinion the regulation was undoubtedly a valid exercise of the Commissioner's power to construe a generally worded statute. See Preliminary Report on Depletion, Staff Reports to the Joint Committee on Internal Revenue Taxation (1930), p. 68 (Shepherd Report); *Helvering* v. *Wilshire Oil Co.,* 308 U. S. 90, 102–103. The Revenue Act of 1943 (58 Stat. 21, 45), which added to the 1939 Code the provisions governing this case, represented only a limited departure from the 1933 Regulation, or from the administrative action taken under it, principally in the area of extractive processes applied to minerals not customarily sold in the form of a crude product, and did not basically affect the meaning of the term "gross income from the property." See, *e. g.,* Revenue Act of 1943, Hearings before the Senate Committee on Finance, 78th Cong., 1st Sess., on H. R. 3687, pp. 527–529; S. Rep. No. 627, 78th

Cong., 1st Sess., pp. 23–24; Revenue Revision of 1942, Hearings before the House Committee on Ways and Means, 77th Cong., 2d Sess., p. 1202; compare *id.,* at 1199; Silver, Hearings before the Senate Special Committee on the Investigation of Silver, 77th Cong., 2d Sess., pursuant to S. Res. 187 (74th Cong.), pp. 761–764. Respondent's efforts to impugn the force of that Regulation, see Shepherd Report, *supra,* at 70, 71; Revenue Revisions, 1947–1948, Hearings before the House Committee on Ways and Means, 80th Cong., 1st Sess., p. 3283; Mineral Treatment Processes for Percentage Depletion Purposes, Hearings before the House Committee on Ways and Means, 86th Cong., 1st Sess., pp. 258, 264, seem to me quite unpersuasive.

This history, in my view, provides an authoritative and controlling gloss upon the term "commercially marketable mineral product or products" in the statutory definition of "mining," which in turn constitutes the "property" with which the statute deals. See *Helvering* v. *Wilshire Oil Co., supra.* It results, on this record, in limiting respondent's basis for depletion to its constructive income from raw fire clay and shale.