Flora I. JOHNSON, Clarence G. Johnson and Hal W. Johnson, Appellants,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Appellee.

Robert L. PHINNEY, District Director of Internal Revenue, Appellant,

v.

Flora I. JOHNSON, Clarence G. Johnson and Hal W. Johnson, Appellees.

No. 18583.

United States Court of Appeals
Fifth Circuit.

March 15, 1961.

C. W. Wellen, Charles W. Hall, Fulbright, Crooker, Freeman, Bates & Jaworski, William M. Ryan, Houston, Tex., for taxpayers.

James P. Turner, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., Charles K. Rice, Asst. Atty. Gen., Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Arthur L. Moller, Asst. U. S. Atty., Houston, Tex., for Robert L. Phinney.

Before TUTTLE, Chief Judge, HUTCHESON, Circuit Judge, CLAYTON, District Judge.

TUTTLE, Chief Judge.

This appeal raises the question touching on the right of the owner of gas wells to deduct the 27½% depletion from payments received as "shut-in royalty payments" and as "delayed rentals." The facts were all stipulated. The opinion of the District Court is published at 181 F.Supp. 315.

Briefly stated, the issue arises from the following relationships between the taxpayers and Superior Oil Company: The taxpayers owned an 8165.64-acre tract of land in Hidalgo County, Texas, which they leased to Superior. The

lease was for a primary term of five years, and "as long thereafter as oil, gas or other mineral is produced in paying quantities thereunder * * * subject to the further provisions hereof:" The lessors "excepted and reserved" royalties of 5/16ths of oil produced and saved and 5/16ths of the gas. If drilling operations were not commenced within one year the lease would terminate unless the lessee paid a delay rental of $5.00 per acre, which would defer the drilling obligation for twelve months.

The paragraph specifically involved in this litigation is paragraph 16, which reads as follows:

"If at the expiration of the primary term hereof, or at any time or times thereafter, there is any well on said land, capable of producing oil or gas, but which may be shut-in due to a lack of a satisfactory market, this lease shall nevertheless, continue in force as long as any such well or wells may be shut in, and thereafter, this lease may be continued in force as if no shut-in had occurred, provided Lessee exercises all reasonable diligence to obtain a market for such production, but in the exercise of such diligence, shall not be obligated to construct plants, pipe lines, or other facilities off the leased premises, or to settle labor disputes, or to market gas on terms considered to be below the fair market value of same. Provided further, that Lessee shall not have the right to continue this lease in force, except as to 40 acres around each oil well and 320 acres around each gas well, capable of producing all the manner above provided, unless within 90 days after the last such well is shut in. Lessee shall pay or tender to Lessor the Five ($5.00) Dollars per acre rental provided herein on that portion of the acreage not selected by Lessee around an oil or gas well, and likewise thereafter, annually, or on or before such date, pay or tender said rentals, during such shut-in period.

"Lessee shall also, annually, during such shut-in period, and within the time specified above for payment or tender of rentals, pay Lessor, as royalty, Five ($5.00) Dollars per acre for each acre selected by Lessee around each oil or gas well so shut in."

During the primary term, between April 1953 and January 1954, four gas wells capable of producing gas in paying quantities were completed on the taxpayers' land by Superior. There was no gas pipeline, however, to which any of them could be connected and under the terms of the lease all four were shut in for lack of a satisfactory market by January 25, 1954.

On April 25, 1954, 90 days after the four wells had been shut in, Superior Oil Company made total payments of approximately $40,828.20 ($5.00 per acre for the 8,165.64 acres under lease) to the taxpayers, thereby exercising its right to make rental and royalty payments as to the entire acreage under Section 16. A similar payment was made on April 25, 1955, and April 25, 1956. Since April 25, 1954, no other payments were made under the lease during these years.

Taxpayers did not originally claim depletion with respect to the taxable years 1954 through 1956, but subsequently filed claims for refund, and upon their denial they filed this suit to recover an alleged overpayment of taxes representing the 27½% depletion on the payments of $40,828.20 per year.

The District Court held that there were two classes of payments which made up the total amount of $40,828.20 paid in each of the taxable years, i. e., a payment denominated a "royalty" of $5 per acre for the 320 selected acres around each shut-in gas well and a "rental" of $5 per acre paid for the remaining acreage under lease. It concluded that under the law of Texas the shut-in "royalty" would be characterized as a minimum or substitute royalty, but that the remainder of the payment would be classed as a rental since it serves to continue the lessee's interest and to delay forfeiture of

the lease. Applying federal tax law to the payments so characterized, the court held, entitled the taxpayers to a 27% depletion allowance on the "royalty" of $5 per acre for the 320 acres around each shut-in gas well ($6,400 per year), but not as to the $5 per acre "rental" paid under paragraph 16 on account of the remaining acreage (34,428.20 per year). Each of the parties has appealed from the portion of the judgment adverse to it.

■ The taxpayers, mistakenly, proceed on the theory in their appeal here that the Director did not appeal from the decision of the trial court which held that the $5 per acre, denominated "shut-in royalty" was subject to depletion. Taxpayers argue that there is no substantial distinction so far as the depletion concept is involved between these payments and the payments made by Superior on account of the remaining acreage. In this connection taxpayers state "The primary point the taxpayers desire to make in this portion of their brief is that there is no difference between the payments *conceded* to be shut-in royalty and the payments made with respect to the balance of the acreage and that, therefore, all payments should be treated as shut-in royalty." We should not, and we do not, take this statement by the taxpayers as binding on them, because it was made under a mistake of fact, i. e., that the director conceded that the 320 acre payments were subject to depletion. In point of fact, the government did not and does not *concede* the shut-in royalty is properly depletable. This misunderstanding arose from the fact that the government's appeal was not noted in the printed record although it is properly before the court in the original record. Taxpayers, therefore, proceeded on the incorrect assumption that the Director conceded the correctness of the trial court's holding touching on the payments made as to the 320-acre tract.

Nevertheless, we think that the taxpayers' statement that there is no difference between the two types of payments,

so far as relates to their depletability, is correct. We conclude that the trial court erred in its decision that the $5 per acre for the 320 acres around each shut-in gas well was subject to depletion, but that the trial court was correct in its decision that the $5 per acre rental paid on account of the remaining acreage was not subject to depletion.

The latest statement by the Supreme Court as to the nature of mineral depletion for income tax purposes is in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 81, 80 S.Ct. 1581, 1584, 4 L.Ed. 2d 1581, where the Court said: "In summary, mineral depletion for tax purposes is an allowance from income for the exhaustion of capital assets," citing Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277. And, further, in the Cannelton opinion, the Court said: "The percentage allowed was based on 'gross income from the property,' which was described as 'the gross receipts from the sale of oil and gas as it is delivered from the property.'"

■ We have most recently undertaken to state the true concept of depletability of income from mineral properties in Scofield v. LaGloria Oil & Gas Co., 5 Cir., 268 F.2d 699, certiorari denied 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed. 2d 355, motion for rehearing denied 361 U.S. 973, 80 S.Ct. 585, 4 L.Ed.2d 552. There we pointed out that an essential factor in the allowability of depletion to income derived from oil or gas interests was "that the taxpayer must look solely to the *extraction* of oil or gas for a return of his capital." (Emphasis added.) 268 F.2d at page 705. See Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904. Regardless of what the $5 per acre payments here were called, they were payments made neither in return for the extraction of oil or gas nor in contemplation of that event. Conceptually, therefore, they clearly fall without the range of depletable income.

The taxpayers contend that these payments should be equated to bonus payments which have long been held to be

depletable. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, Murphy Oil Co. v. Burnet, 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318, and Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. Whatever might be said of the correctness of this holding as to bonus payments the distinction is obvious. Bonus payments are made in contemplation of production and represent added payment for such production as later results. The payments covered by the instant lease are not in contemplation of production but are payments made *solely because there will be no production.* Obviously there will be no depletion of the wasting assets owned by taxpayers.

Taxpayers cite no case and we have found none that permits the application of the 27½% depletion allowance to income that is no way related to actual or anticipated production.

The judgment is reversed and the case on the Director's appeal is remanded for the entry of a judgment in favor of the defendant District Director.