Melrose Granite Company v. Commissioner.
Melrose Granite Co. v. Commissioner
Docket No. 75233.
United States Tax Court
T.C. Memo 1961-197; 1961 Tax Ct. Memo LEXIS 152; 20 T.C.M. (CCH) 982; T.C.M. (RIA) 61197; June 30, 1961
*152 Held, that the "commercially marketable mineral product" of the petitioner, an integrated granite quarrier and manufacturer of finished granite products, was the "rough blocks" of granite as extracted from its quarries and loaded for shipment from the quarries, rather than its finished products which were grave monuments and building stone. Petitioner's deductions for percentage depletion under sections 23(m) and 114(b)(4) of the 1939 Code, were correctly determined by respondent to be computable with reference to its constructive income from the "rough blocks" of granite after loading for shipment. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, followed. John W. Windhorst, Esq., and Charles O. Howard, Esq., for *153 the petitioner. Arthur B. Bleecher, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioner's income taxes for the years 1952 and 1953 in the respective amounts of $6,250.02 and $1,182.69. The basic issue presented for decision is: What was the "commercially marketable mineral product" of the petitioner (an integrated quarrier of granite and manufacturer of granite products) - the income from which mineral product is to be used in computing petitioner's deductions for percentage depletion under sections 23(m) and 114(b)(4) of the 1939 Code. [1]
Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioner, Melrose Granite Company, is a corporation organized under the laws of the State of Minnesota, with its principal office in St. Cloud, Minnesota. It filed its corporation income tax return for each of the taxable calendar years 1952 and 1953 *154 here involved, with the district director of internal revenue for the district of Minnesota. Prior to and during the taxable years involved, as well as in years subsequent thereto, petitioner was engaged in the integrated businesses of quarrying granite and of manufacturing the same into monuments (used principally for grave markers), and also into building stone. The monuments which petitioner manufactured (in the manner hereinafter described) were sold by it to approximately 350 retail monument dealers, located in a 30-state area lying roughly between the Rocky Mountains on the west and the Appalachian Mountains on the east. The building stone, on the other hand, was sold on an individual job basis, i.e., petitioner bid as a subcontractor to furnish granite building stone on particular construction projects. During said taxable years, petitioner operated five quarries, which were located at or near the following cities: Name of Quarry
Location
Red Quarry
St. Cloud, Minnesota
Gray Quarry
St. Cloud, Minnesota
Tapestry Quarry
Morton, Minnesota
Radiant Red Quarry
Montevideo, Minnesota
Russet and Prairie
Brown Quarry
Milbank, South Dakota
During the taxable *155 years, petitioner's only fabricating plant for applying the treatment processes (hereinafter described) to the granite which it quarried, was located at St. Cloud. The techniques and procedures utilized by petitioner in extracting or removing granite from its quarries, [2] may be summarily described as follows. First, a solid ledge of granite in an outcropping was selected, whereon an operation called "channeling" was begun. Channeling involved drilling a series of holes to a depth of approximately 8 feet, on the perimeter of a 4feet X 4feet square on the surface of the ledge. Following such drilling, the spaces between the holes were either "broached" or drilled, in order to separate the side surfaces of a block of approximately 4feet X 4feet X 8feet from the ledge. Another hole was then drilled in the center of this original block (called the "key" block); and said center hole was then filled with an explosive, which was detonated in order to separate the bottom of the key from the ledge. The key block was thereupon removed, thus providing an initial opening in the ledge from which further channeling was done. Through use of such channeling process, blocks of granite (varying in *156 size from 50 cubic feet to 250,000 cubic feet) were separated from the ledge. The larger blocks of granite were thereafter cut into smaller blocks by use of the socalled "plug-and-feather" method, [3] so that they could be lifted out of the quarry by means of fixed derricks which petitioner employed for that purpose. Following removal from the quarry, the irregularly shaped blocks were squared to a rectangular shape by further application of the plug-and-feather method, in order to facilitate loading onto trucks or railroad flat cars for shipment to petitioner's fabricating plant, [4] and also to make the blocks ready for the finishing processes applied at such fabricating plant. At the point where the blocks are loaded onto trucks or flat cars, they were called in the granite industry, "rough blocks." (Such rough blocks loaded onto trucks or flat cars at the quarry sites, are contended by the respondent to be petitioner's "commercially marketable mineral product.") *157 Of the total granite separated from a ledge in the manner above described, about 80 percent thereof was discarded at the quarry as waste, because of defects found in the stone which rendered it unsuitable for finishing into monuments or building stone. The portion of the granite so discarded was heaped into piles at the quarry site, and no sale or use was made thereof. The remaining 20 percent of the quarried granite was shipped by truck or rail to petitioner's fabricating plant in St. Cloud, where various finishing processes were there applied to produce petitioner's principal finished products, i.e., monumental grave stones, and a relatively minor quantity of building stone. When the rough blocks arrived at petitioner's fabricating plant, they were unloaded and placed under so-called "gang" or "circle" saws which cut them into slabs having parallel sides, and thicknesses varying from 2 to 14 inches. The slabs were then examined for defects; and if such were found, the defective portions were removed through use of the plug-and-feather method. The product at this stage of processing was called in the industry, a "sawed slab." The sawed slabs were thereupon taken to a department *158 of the plant called a "polishing mill," where the slabs were polished, usually on both sides but sometimes only on one side. The first step in the polishing process was the application of "steel shot with a steel scroll" to level off or smooth the surfaces of the granite. Then the slab was sent to an "emery machine" where a silicon carbide material was "fed under a steel scroll" to hone the slab. And finally in the polishing mill, the slab was moved to "a mill felt buffing wheel" where iron or tin oxide was applied to create a polished surface on the slab. All of the foregoing three processes were applied to each slab sent to the polishing mill, since the slabs traveled on a continuous conveyor belt. The product leaving the polishing mill was known in the granite industry as a "polished slab." Certain defects of both structure and appearance in the slabs become visible only after the slab had been polished; and this necessitated the discarding of approximately 50 percent of the polished slabs produced by petitioner. The next steps taken at petitioner's fabricating plant were to transform certain of the polished slabs into finished monuments. [5] These steps involved the use of "wire *159 saws, carborundum saws, shot saws, [and] hand tools," so as to convert the slabs into monuments of various and sundry shapes, to put various types of surfaces on the ends and tops of the tablets, and to bevel the edges of the bases. Additional defects and imperfections were sometimes found in the slabs during this stage of processing, which necessitated the discarding of some of the stone as being unacceptable to retailers of monuments. (Finished monuments, at this stage, are contended by the petitioner in the instant case, to be its "commercially marketable mineral product"; and all of the above-described processes applied in fabricating finished monuments are contended by petitioner to constitute its "ordinary treatment processes" to obtain such products.) *160 A final set of processes known as "carving" (imprinting designs) and "engraving" (lettering) were applied to some of the monuments, in the "sand blast" department of petitioner's fabricating plant. Petitioner conceded at the trial that such carving and engraving were not "ordinary treatment processes" in arriving at a "commercially marketable mineral product." During the taxable years involved, petitioner, in addition to extracting granite from its own quarries purchased some rough blocks of granite from other quarries, which it manufactured into monuments and building stone in its fabricating plant; and also, it sold some of the rough blocks mined from its own quarries. The following table shows the cubic feet of granite in rough block form which petitioner purchased from others, the names of the quarriers from which the purchases were made, and petitioner's cost of the granite so purchased, in each of said years: No. of cubic
Type of granite
feet pur-
Total
purchased
Sellers
chased
cost
1952
Mesaba pink and
coral red
Mesaba Granite Co., Hibbing, Minn.
8,106.6
$12,530.12
Barre, Vermont,
Wells-Lamson Quarry Co., Barre, Vt.,
gray granite
and E. L. Smith Quarry, Barre, Vt.
2,331.2
5,414.46
Sacred heart
Rex Granite Co., St. Cloud, Minn.
124.4
248.66
Total for 1952
10,562.2
$18,193.24
1953
Mesaba pink and
Coral red
Mesaba Granite Co., Hibbing, Minn.
9,764.8
$16,467.20
Barre, Vermont,
Wells-Lamson Quarry Co., Barre, Vt.,
gray granite
and Monumental Sales & Manufactur-
ing Co., St. Cloud, Minn.
1,359.8
3,316.94
Wausau red
Honer Granite Co., St. Cloud, Minn.;
Empire Memorials, Inc., Melrose, Minn.;
St. Cloud Monument Co., St. Cloud,
Minn.; and Delf Quarry, Wausau, Wisc.
156.0
808.59
Sacred heart
Rex Granite Co., St. Cloud, Minn.
132.6
482.82
Total for 1953
11,413.2
$21,075.55
*161 The granite taken from petitioner's own quarries during the taxable years was disposed of in three principal ways: (1) Sale as rough blocks; (2) sales as finished monuments; and (3) sale as finished building stone. The following table shows: (1) The total cubic feet of rough block produced at petitioner's quarries; (2) the portion thereof which was sold as rough blocks to other fabricators; and (3) the total amount received by petitioner from its rough block sales: Total granite
Portion of pro-
Total amount
rough blocks
duction sold as
received from
produced
rough blocks
sales of
Quarry
(cubic feet)
(cubic feet)
rough blocks
1952
1953
1952
1953
1952
1953
Red
27,694
30,932
9,918.1
10,327.8
$15,708.69
$17,191.42
Tapestry
11,800
15,030
6,525.2
5,278.2
8,822.87
7,856.47
Gray
5,876
42,292
692.8
2,877.4
1,008.93
4,246.49
Russet and Prairie
Brown
79,800
82,680
431.0
157.3
473.01
136.67
Radiant Red
9,900
10,920
None
None
None
None
Total
135,070
181,854
17,567.8
18,640.4
$26,013.50
$29,431.05
Petitioner's gross income was derived from the following sources *162 during the taxable years involved: 1952
1953
Sales of rough blocks
$ 26,013.50
$ 29,431.05
Sales of finished building and monumental stone
959,495.68
1,000,066.41
Total
$985,509.18
$1,029,497.46
Sales of riprap
2,000.00
2,100.00
Total gross income from sale of granite
$987,509.18
$1,031,597.46
Miscellaneous income from intangibles, rents, purchase
discounts and sales of capital assets
12,437.46
10,142.44
Total gross income
$999,946.64
$1,041,739.90
During the taxable years involved (and apparently also prior and subsequent thereto) there were three principal granite-producing areas in the United States: (1) The area in and around Barre, Vermont; (2) the Georgia-North Carolina area (comprising the northern part of Georgia and the western part of North Carolina); and (3) the midwest area (comprising portions of the States of Wisconsin, Minnesota, and South Dakota). In addition to the foregoing 6 states, granite was also produced in 16 other states. [6]
*163 The granites produced in the Vermont area and in the Georgia-North Carolina area were similar in appearance - both being of a fine-grained, even-textured gray appearance. The Vermont granite was very hard; and the Georgia-North Carolina granite somewhat less so. Quarriers of granite in these two areas were able to cull the defective portions of their production at their quarries, with the result that the rough blocks which they shipped to monument fabricators were rarely, if ever, found to be defective. All of the granite produced in Vermont during the taxable years, which was ultimately used for monuments, was sold in rough block form. Most of the monument granite produced in Georgia and North Carolina was also sold in rough block form. As regards granite produced in the United States as a whole, which was ultimately used for monuments, over 70 percent in each of the years 1952 and 1953 was marketed in rough block form. [7]
During the taxable years involved, granite was not confined in its use to monuments and facings for buildings. It was also used for paving blocks, curbing and bridge abutments. And in addition, granite was crushed and sold for use as *164 riprap, concrete aggregate, railroad ballast, and as an ingredient in poultry food. [8]
The granites produced in the midwest area are, by way of contrast, of many and varied colors - red, purple, brown, pink, gray, black, blue, and mixtures of these colors. The experience of those engaged in the granite industry in the midwest area, like that of the petitioner in the instant case, has been that it was not possible to cull all the defective granite from their production at the quarry sites. Some defects were discovered at the point where the rough blocks were sawed into slabs; many more defects were discovered when the slabs were being polished; and some defects were not discovered until the polished slabs were being converted into finished monuments. The effect of inability to completely cull the defective rough blocks from the productions of midwestern quarries was, that monument fabricators were reluctant to purchase rough blocks from quarries in that area - for they realized that such purchases might result in their bearing freight charges and costs of fabrication on blocks of granite that might prove to be unusable for monuments. The monument portion *165 of the granite industry is composed of quarriers, sawyers, polishers, decorators, and both wholesale and retail distributors. There are some companies whose entire effort is directed to only one phase of the business, but most often a company will concern itself with two or more divisions of the industry. Several of the larger companies are completely integrated, from the quarrying operation all the way to and including retail sales to purchasers of monuments. While the larger companies are more significant in terms of dollars and physical volume of business, such companies are fewer in number than the smaller companies which are concerned with intermediate stages of production, as well as marketing of monuments. In the midwest area, the members of the granite industry were grouped into the following categories. There were four companies which did quarrying only and sold their entire production in rough block form. There were 14 companies (like petitioner) which carried on the integrated businesses of quarrying granite and manufacturing the same into finished products. There were 15 other companies which performed only fabricating operations on rought blocks purchased from members *166 of the first two groups. The amounts of granite quarried in 1952 and 1953 by those midwest quarries concerning which testimony was received in the instant case, and the disposition made thereof, were as follows (in cubic feet): Total amount
Polished
removed from
Rough block
Sawed slab
slab
Year
quarries
sales
sales
sales
1952
862,087.1
107,406.1
17,647
3,980
1953
951,979.9
101,263.4
23,357
5,292 The great bulk of the remainder of the granite produced was sold as finished monuments or building stone. Petitioner, on its Federal income tax return for each of the years involved, computed its percentage depletion deduction in the following manner: Produced
Purchased
at own
from others
quarries
Total
1952
Gross sales of granite
$56,781.76
$930,727.40
$ 987,509.18
Cost of goods sold
51,210.99
811,642.64
862,853.63
Gross profit from sales of granite
$ 5,570.79
$119,084.76
$ 124,655.55
Selling and administrative costs
5,060.23
82,943.82
88,004.05
Net income from granite
$ 510.56
$ 36,140.94
$ 36,651.50
1953
Gross sales from granite
$33,423.77
$998,173.69
$1,031,597.46
Cost of goods sold
30,328.82
877,713.69
908,042.51
Gross profit from sales of granite
$ 3,094.95
$120,460.00
$ 123,554.95
Selling and administrative costs
3,172.30
94,738.15
97,910.45
Net income from granite
($ 77.35)
$ 25,721.85
$ 25,644.50
*167 PERCENTAGE DEPLETION
1952
1953
5% of gross income from first marketable products
(see
"Gross sales of granite" produced at our quarries)
$46,536.37
$49,908.68
Depletion limitation 50% of net income from granite--quarried (see "Net income from granite" produced at our quarries)
$18,070.47 *
$12,860.92 *
Respondent, in his statutory notice of deficiency, determined that the amounts deductible by petitioner for percentage depletion were $6,193 for 1952, and $8,304.67 for 1953 (based upon petitioner's constructive gross income from its rough blocks of granite, after loading on trucks or flat cars for shipment from its quarries). Opinion The broad question presented by this case is, what is the proper amount deductible by the petitioner as percentage depletion, under sections 23(m) and 114(b)(4) of the 1939 Code, the here-relevant provisions of which are set forth in the margin. [9] The parties are in agreement that petitioner is entitled to use the percentage depletion method for computing its deductions, and that the proper rate to be used is 5 percent. Their disagreement *168 is as to the petitioner's "gross income from mining" (section 114(b)(4)(B)), to which the 5 percent rate is to be applied. The controversy is in substance, as stated by petitioner at the outset of its principal brief: [Whether] the petitioner's gross income from mining under Section 114(b)(4)(B) of the Internal Revenue Code of 1939 is [to be] based on the gross income attributable to the production of rough granite blocks at the quarries operated by petitioner, as contended by respondent, or whether petitioner's gross income from mining is [to be] based on the gross income attributable to the sale of finished granite for building purposes and for monumental purposes exclusive of gross income derived from carving and engraving such monuments, as contended by petitioner. * * * *169 We are immeasurably helped in our task of resolving the issue here presented by the recent Supreme Court case of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76 - for the opinion therein has served to bring the basic theory and purpose of depletion allowances into proper focus, and thereby limit the field of controversy which had existed in many of the preceding cases dealing with this subject. The taxpayer, in that case, owned and operated an underground mine from which it produced fire clay and shale, which was then transported to a plant where the same was processed and fabricated by the taxpayer into vitrified sewer pipe, flue lining, and related products. The taxpayer there contended that its commercially marketable mineral product was its sewer pipe and other vitrified articles; and that its depletion allowance should have been computed on the basis of its gross income from the sales of such finished products. The Government contended, on the other hand, that the taxpayer's commercially marketable mineral product was its raw fire clay and shale, loaded for shipment at the mine; and that the depletion deduction should have been computed on the basis of the *170 representative market value of the raw fire clay and shale, as established through sales of such material by other miners in the taxpayer's vicinity. The Supreme Court, in reversing the holdings of the lower courts, concluded that the taxpayer's depletion deduction should be based on its gross income from mining only, computed with reference to the value of its raw fire clay and shale, after the application of the ordinary treatment processes normally applied by nonintegrated miners engaged in the recovery of those minerals. Because we believe that the rationale of the Cannelton case is applicable to the instant case, we quote from the Supreme Court's opinion therein rather extensively. The Court, after extensively reviewing the legislative history of the percentage depletion provisions generally, and after pointing out that the underlying purpose thereof was to provide an allowance from income for the exhaustion of capital assets, stated in part: II. * * * From this legislative history, we conclude that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the *171 finished articles. III. The findings * * * [of the trial court indicate] that fire clay and shale were "commercially marketable" in their raw state unless that phrase also implies marketability at a profit. We believe it does not. Proof of these sales is significant not because it reveals an ability to sell profitably - which the respondent could not do - but because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption - in short, they have passed the "mining" state on which the depletion principles operates. It would be strange, indeed, to ascribe to the Congress an intent to permit each miner to adopt processes peculiar to his individual operation. Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the highcost mine operator. The value of respondent's [i.e., taxpayer's] vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The question in depletion is what allowance is necessary to *172 permit tax-free recovery of the capital value of the minerals. Respondent insists that its miner-manufacturer status makes some difference. We think not. It is true that the integrated miners in Indiana outnumbered the nonintegrated ones. But in each of the three basic percentage depletion Acts the Congress indicated that integrated operators should not receive preferred treatment. Furthermore, in Regulations 77, discussed above, the Treasury specifically provided that depletion was allowable only on the crude mineral product. * * * Ever since the first percentage depletion statute, the cut-off point where "gross income from mining" stopped has been the same i.e., where the ordinary miner shipped the product of his mine. Respondent's formula would not only give it a preference over the ordinary nonintegrated miner, but also would grant it a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned. IV. We now reach what "ordinary treatment *173 processes" are available to respondent under the statute. * * * respondent says that the processes it uses are the ordinary ones applied in the industry. As to the miner-manufacturer, that is true. But they are not the "ordinary" normal ones applied by the nonintegrated miner. It was he whom the Congress made the object of the allowance. The fabrication processes used by respondent in manufacturing sewer pipe would not be employed by the run-of-the-mill miner - only an integrated miner-manufacturer would have occasion to use them. We think that what was said by the Supreme Court in the Cannelton case is here applicable and controlling. In the instant case also, the taxpayer-petitioner was an integrated miner-manufacturer; and here too, the great bulk of the output of taxpayer-petitioner's mines was used in its own manufacturing processes. Nevertheless, as shown by our Findings of Fact, there were during the taxable years, not only purchases and sales of midwest granite in rough block form made both by petitioner and other integrated or partially integrated quarriers and fabricators, but also sales of such rough block granite made by others who engaged in quarrying only, which are *174 sufficient to establish that such granite in such form was being produced and sold for industrial use, and that the same did constitute a "commercially marketable mineral product." The fact that petitioner and other midwest quarriers sold a smaller percentage of their granite in rough block form than did quarriers located in the Vermont and the Georgia-North Carolina areas, is in our view not determinative. The percentage depletion provisions of the statute make no differentiation between particular localities or particular types of businesses; but rather, they relate to the mining of "natural deposits" including deposits of granite, generally. As was pointed out in the Cannelton case, the purpose of these provisions is to permit tax-free recovery of capital assets mined, including only the crude mineral product shipped by the ordinary miner from his mine; such provisions were not intended to give the integrated miner-manufacturer a competitive advantage over its nonintegrated competitor by permitting it to take into account fabricating processes not employed by the run-of-the-mill miner; and, in applying these provisions, the cut-off point where "gross income from mining" stops *175 has been the same ever since the first percentage depletion statute was enacted, i.e., where the ordinary miner (as distinguished from the integrated miner-manufacturer) shipped the product of his mine. We hold that petitioner's "commercially marketable mineral product" during all taxable years here involved, was the rough granite blocks when loaded aboard railroad cars or trucks for shipment from its quarry sites; and that petitioner's "ordinary treatment processes" were only those operations which were concerned with extracting the granite from its quarries and with preparing and handling the rough blocks to the point where they were loaded aboard railroad cars or trucks for shipment from the quarry sites. Decision will be entered under Rule 50. *
Footnotes
1. All section references herein are to the Internal Revenue Code of 1939, as amended, unless otherwise specified.↩
2. Petitioner used the same quarrying methods in all its quarries. ↩
3. A "feather" is a strip of steel rounded on one side and flat on the other. A "plug" is a beveled steel wedge. The feather is first inserted into a pneumatically drilled hole, and then the wedge is also introduced into the hole, between the flat surface of the feather and the wall of the drilled hole. The plug is then struck with a sledge hammer, until the resultant pressure causes a cleavage to occur in the granite. ↩
4. The parties are in agreement that the distances from the several quarries to the fabricating plant were as follows: ↩
Miles from
Quarry
Fabricating Plant
Red
5
Gray
5
Tapestry
110
Radiant Red
110
Russet and Prairie Brown
140
5. The principal products manufactured and sold by the petitioner were monuments for use as grave markers. Approximately 95 percent of its sales during the taxable years were of such monuments; and the remaining 5 percent of the sales were of building stone, for use as "facing" in both the interiors and exteriors of buildings. The monuments sold by petitioner were usually composed of two stones: (1) A base, which was placed in the ground at the grave site; and (2) a tablet which stood erect upon the base.↩
6. Based upon data in a preprint from the Bureau of Mines Mineral Yearbook for each of the years 1952 and 1953. These Yearbooks are official publications of the United States Department of the Interior.↩
7. See footnote 6.↩
8. See footnote 6.↩
*. These are the amounts claimed as deductions on petitioner's returns.↩
9. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(m) Depletion. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * *. For percentage depletion allowable under this subsection, see section 114(b), (3) and (4). SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. * * *
(b) Basis for Depletion. * * *
(4) Percentage Depletion for Coal and Metal Mines and for Certain Other Mines and Natural Mineral Deposits. - (A) In General. - The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be - (i) in the case of * * * granite * * * 5 per centum, * * *
of the gross income from the property during the taxable year * *. Such allowance shall not exceed 50 per centum of the net income of the taxpayer * * * from the property * * *. (B) Definition of Gross Income from Property. - As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *↩
*. The words "Decision will be entered for the respondent" were deleted and the words "Decision will be entered under Rule 50" were added by an official order of the Tax Court, dated August 25, 1961 and signed by Judge Pierce.↩