SOLITE CORPORATION, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 10861.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 7, 1967.

Decided March 30, 1967.

T. Howard Spainhour, Norfolk, Va. (Kaufman, Oberndorfer & Spainhour, Norfolk, Va., on brief), for appellant.

Thomas L. Stapleton, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, C. Vernon Spratley, Jr., U. S. Atty., and James A. Oast, Jr., Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and J. SPENCER BELL and CRAVEN, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

This is an appeal by the plaintiff taxpayer from an adverse judgment of the district court in a suit to recover alleged overpayments of federal income tax for 1958.

The taxpayer, a Virginia corporation, is engaged in the production of a lightweight aggregate used in the manufacture of building blocks and other building units. The lightweight aggregate, known by the trade name "Solite," is produced from a weathered material mined by the taxpayer. The processes employed by the taxpayer, some of which are patented, were stipulated by the parties as follows:

"(a) The overburden, consisting of top soil on the surface of the ground, is first removed.

"(b) The weathered material lying below the top soil is then drilled and blasted and loaded on trucks, which carry said material to the plaintiff's plant located a short distance (approximately one-half mile) from the quarry.

"(c) The material is dumped from the trucks into the primary crusher and screener, where it is crushed and screened and then conveyed by a conveyor belt to a stock pile, from which it is conveyed by a conveyor belt and bucket elevator to a rotary kiln.

"(d) The material is fed into the high end of the rotary kiln (which is on an inclined axis) and as the kiln turns the material passes slowly from the higher end of the lower kiln, from which heat is blown into the kiln.

"(e) The material drops from the lower end of the kiln to the ground, where it stays long enough to become cool.

"(f) The material is then placed, through the use of a clam shell bucket and crane, in the secondary crusher and screener, where it is crushed and screened and then loaded by a conveyor belt into freight cars."

It was also stipulated that no other material of any kind is added during the processing and that the taxpayer sells all of the processed material and does not use any of it in the manufacture of any other product.

■ The parties agree that the taxpayer is entitled to a five per cent deple-

tion allowance under section 613 of the Internal Revenue Code of 1954.[1] The Government contends, however, that the taxpayer is entitled to a depletion allowance only on that portion of its gross income attributable to steps (a) through (c) of the processing set out above. The taxpayer, on the other hand, argues that it is entitled to a percentage depletion allowance on its entire gross income from the sale of the lightweight aggregate after all processing, or at least through step (d) (the kiln process). The district court held that only the gross income from the first three steps ((a) through (c)) of the processing could be considered in determining the amount of the taxpayer's depletion allowance, and we affirm.

The depletion allowance provided by section 613 is the allowable percentage "of the gross income from the property." 26 U.S.C.A. § 613(a). The term, "gross income from the property," is defined in subsection 613(c) (1) as "the gross income from mining," and the term "mining" is defined in subsection 613(c) (2) as including "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *."[2] The question for consideration on appeal is to what extent plaintiff taxpayer's processes are "ordinary treatment processes" within the meaning of the statute.

Subsection 613(c) (4) specifies certain processes which will be considered mining under the statute, and the taxpayer contends that its kiln process is specifically included in that subsection:

"(4) *Ordinary treatment processes.* —The term "ordinary treatment processes" includes the following:

\* \* \* \* \* \*

(C) in the case of * * * minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; * * *"

The district court found that the lightweight aggregate is not "customarily sold in the form of a crude mineral product" after the kiln process (established by the record to be a "sintering" process), and that the sintering is not for the purpose of bringing the material "to shipping grade and form." The district court's findings are adequately supported by the record and are not clearly erroneous.

The construction of "ordinary treatment processes normally applied * * * to obtain the commercially marketable mineral product or products" was recently considered by the United States Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S. Ct. 1581, 4 L.Ed.2d 1581 (1960). In that case the Court made it clear that percentage depletion cannot be used to give an advantage to the integrated miner-manufacturer which is not shared by nonintegrated miners and manufacturers. The taxpayer in the case at bar contends that it is not an integrated miner-manufacturer but a miner only, that it sells its product when it first becomes "commercially marketable," and that prior to the kiln process, the weathered material, which is a soft slate, is worthless. The district court found that there was no actual market for the taxpayer's mineral before the kiln process and that "unless used for processing in the final production of lightweight aggregate, it is universally discarded." The *Cannelton* case established that actual sales by the taxpayer are not required in order for a mineral to be classified as "commercially marketable." The

---

1. Because the instant proceeding is for the recovery of overpayments for the fiscal year which ended March 31, 1958, we are not concerned with the amendments to the statute which have become effective after that date.

2. The wording of 26 U.S.C.A. § 613(c) (2) was substantially changed by a 1960 amendment.

Court in *Cannelton* also stressed that depletion is not allowed for processes designed to give a mineral worth "but for exhaustion of mineral assets alone." Id. at 88, 80 S.Ct. at 1588. The Court stated that if the mineral is worthless there can be no depletion: "One cannot deplete nothing." Ibid.

Neither is it determinative that the taxpayer is apparently the only producer in the United States of lightweight aggregate from this particular material, with the result that there are virtually no sales of the material anywhere before it is processed in a kiln, since the material has no use other than in the production of lightweight aggregates. In Virginia Greenstone Co. v. United States, 308 F.2d 669 (4 Cir. 1962), this court held that although the taxpayer in that case had a monopoly on greenstone, in that it controlled the only source of supply, it could not contend that the first "commercially marketable" product was its finished stones, since other dimension stone with which the taxpayer competed was in fact sold before the finishing process. The taxpayer in the instant case does not have a monopoly of the supply of soft slate, but we do not think the existence of such a monopoly is essential to the principle established by the *Virginia Greenstone* case. The record in the case at bar indicates that there are manufacturers of lightweight aggregates processed from various other minerals which compete with the taxpayer's product, and some of them at least purchase the material used in their production rather than mine it themselves. If there are miners of materials used in the production of lightweight aggregates who sell that material before employing the kiln process, then surely miners who themselves employ the kiln process are miner-manufacturers within the meaning of the *Cannelton* case. It is obvious that the construction of the percentage depletion allowance statute contended for by the taxpayer would give it "a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned." United States v. Cannelton Sewer Pipe Co., 364 U.S. at 87, 80 S.Ct. at 1587.

■ We do not interpret the cases as requiring that a market be actually available to the taxpayer in order for its mineral to be "commercially marketable" within the meaning of the statute. In Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 538, 83 S.Ct. 378, 379, 97 L.Ed.2d 492 (1963), the Court pointed out that it had held in the *Cannelton* case that "the statutory percentage depletion allowance on the gross income of an integrated mining operator should be cut off at the point where the mineral first became suitable for industrial use or consumption." Since the material mined by the taxpayer is physically susceptible of being transported, although transporting it over a considerable distance may not be economically feasible, and since others in the same industry purchase similar materials for use in the manufacture of a product substantially the same as the taxpayer's, we conclude that the mineral is "suitable for industrial use or consumption."

The taxpayer points out that in the *Cannelton* and *Monolith Portland Cement Co.* cases there was evidence of "substantial" markets for the minerals there involved. We do not think, however, that a finding of "substantial" sales of the material when it first becomes "suitable for industrial use or consumption" is an essential requirement of the result in those cases. The Eighth Circuit, in United States v. Light Aggregates, Inc., 343 F.2d 429 (8 Cir. 1965), reached the same result even though only three per cent of the total national production of clays and shales, the minerals there in question, were sold by producers in their raw state, and none of those sales were in the taxpayer's state. In that case, as in the case at bar, the taxpayer, a producer of a lightweight aggregate, was attempting to compute its depletion al-

lowance on the basis of the gross income from the sale of its lightweight aggregate after the kiln process. The court held that the kiln process was a manufacturing and not a mining process.

The judgment of the district court is Affirmed.