**KAISER STEEL CORPORATION,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 22272.**

United States Court of Appeals
Ninth Circuit.

April 29, 1969.

Rehearing Denied July 23, 1969.

Edward J. Ruff (argued), George E. Link, Fielding H. Lane, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for appellant.

Grant W. Wiprud (argued), Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Stephen H. Paley, Attys., Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., Richard L. Carico, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before MERRILL, DUNIWAY, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Kaiser Steel Corporation ("Kaiser") sued to recover a refund of federal income taxes for its fiscal years 1949 and 1950. From a judgment for the Government, Kaiser appeals.

The action involves the determination of the appropriate percentage depletion allowance to which Kaiser was entitled by reason of its mining of iron ore and coking coal which it consumed in manufacturing steel at its Fontana, California, plant. Kaiser attacks the findings of the District court, claiming error in the inclusion and exclusion of certain market data in computing Kaiser's constructive gross income from its mining operations.

The federal income tax statutes have long authorized an allowance against gross income for depletion from mining computed as a percentage of the gross income from mining. For the integrated miner-manufacturers, such as

Kaiser, gross income from mining must be created constructively. Constructive gross mining income is the amount which would have been earned if the miner-manufacturer were "disintegrated" and the raw minerals were sold by its mining division as a separate entity to its manufacturing division, likewise a separate entity. The Treasury Regulations, as interpreted by the courts, reflect the policy of achieving a parity of tax treatment between integrated miner-manufacturers and nonintegrated miners. (United States v. Cannelton Sewer Pipe Co. (1960) 364 U.S. 76, 80 S.Ct. 1581, 4 L. Ed.2d 1581; United States v. Henderson Clay Products (5th Cir. 1963) 324 F.2d 7, 15.)

For the fiscal years 1949 and 1950, Treasury Regulation 111, § 29.23(m)–1, specifies the methods by which an integrated miner-manufacturer shall compute his constructive gross income from mining as follows: (1) If the mineral product is processed before sale, " 'gross income from the property' means the representative market or field price * * of a mineral product of like kind or grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product", (2) "[i]f there is no such representative or field price, * * * there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes * * * minus the costs and proportionate profits attributable to the transportation and the processes beyond the ordinary treatment processes"; (3) "[i]f the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method." For convenience we label the methods seriatim, "field price," "proportionate profits," and "taxpayer's alternative."

Section 29.23(m)–1 does not permit the taxpayer to browse freely through these methods and to select the method which most strikes his fancy or to sample pieces of each to formulate a taxpayer's alternative. The field price method is the only available method unless the taxpayer establishes that there is no such price. Only then is the proportionate profits method available to him. He cannot avoid the proportionate profits method in turn unless he can establish that that method does not clearly reflect his gross income and that the taxpayer's alternative does so.

Kaiser's attack upon the District Court's findings is primarily based on its hybridizing these methods and applying the product to the evidence presented to the District Court. Because the market data involved in the iron ore and coking coal operations differ, we take up each separately.

*Iron Ore*

In Kaiser's returns for fiscal year 1949, it reported mining 276,655 net tons of iron ore at its Eagle Mountain mine in Riverside County, California, and 167,970 net tons at its Vulcan mine in San Bernardino County, California. The following year it mined 835,215 net tons of iron ore at Eagle Mountain and nothing at the Vulcan mine. In its original returns for 1949, depletion was based on field prices of $2.89 for Eagle Mountain ore and $3.13 for Vulcan ore. In 1950 depletion was computed using the field price of $3.5455.

Thereafter Kaiser decided that its field prices were too modest, and it filed amended returns for both years, claiming the following prices: for 1949, $3.-584 for Eagle Mountain ore and $4.263 for Vulcan ore (July through December), $4.371 for Eagle Mountain ore and $4.-912 for Vulcan ore (January through June); for 1950, $4.903 (July through December) and $5.376 (January through June) for Eagle Mountain ore. The Commissioner denied Kaiser's claims for

refund based on the revised price schedules, and this action followed.

The District Court assembled the iron ore transactions in Kaiser's marketing area and used the weighted average f.o.b. mine price of those transactions as the field price. The court found that the applicable prices were $2.29 for 1949 and $2.03 for 1950. These prices yield depletion allowances which are less than those permitted Kaiser on its original returns.

Kaiser argues that the District Court's prices were wrong because (1) iron ore sales by Utah Construction and Mining Company ("Utah Construction"), upon which the District Court primarily relied, did not establish a "representative" field price for Kaiser's ore, (2) the court improperly rejected prices prevailing in the lower Great Lakes ports, and (3) even if the court properly accepted Utah Construction's transactions, the court erred in including certain of those transactions in setting prices and in excluding for freight differentials.

In 1949 and 1950 there were only four producers and three consumers of significant quantities of iron ore in California, Oregon, Nevada, Arizona, Utah, Washington, and Idaho. Three of the producers either consumed all of their ore or sold it to related entities. Utah Construction was the only independent producer. Utah Construction operated a mine in Iron Springs, Utah. It made substantial ore sales to Kaiser and to Geneva Steel Company for domestic use and to Japan for foreign consumption. It also sold smaller quantities to other western customers.

The only area in the United States in which there is a large volume of iron ore transactions between independent buyers and sellers is the Great Lakes region. During the years in question, there were no iron ore transactions between producers or consumers in the Great Lakes region and those in the western states. The two marketing areas are separated by a gulf of prohibitive freight rates.

The District Court rejected Kaiser's contention that there is a national market for iron ore and found that the Great Lakes and western markets are separate. Recognizing the futility of making a frontal assault on that finding, Kaiser tries an end play. It is a complicated call because Kaiser seeks to avoid Utah Construction's prices while simultaneously avoiding a determination of "no field price," which would have compelled it to carry the burden of the proportionate profits method, or the potentially greater burden of proving the taxpayer's alternative. Kaiser's argument is that, once relieved of the overburden of vulnerable Utah Construction transactions, the residue of Utah Construction's sales is too thin to make a "representative" market. By adding economically relevant Great Lakes pricing data to the Utah Construction residue, representative pricing in the western market is created.

■ The District Court's finding that Utah Construction's transactions created a field price in Kaiser's marketing area is not clearly erroneous. Utah Construction sold substantial quantities of iron ore at negotiated prices. Kaiser itself purchased 20 percent of the iron ore for its production facilities from Utah Construction: During the fiscal year ended June 30, 1949, Kaiser bought 146,501 net tons at $1.869 per ton f.o.b. Iron Springs, Utah; in the following fiscal year, Kaiser bought 228,924 net tons at $1.901 per ton on the same terms. During the same general period Utah Construction sold 309,475.25 net tons of its ore to Japan for an average of $2.54 per ton f.o.b. mine. These transactions are enough to render invulnerable on appeal the District Court's finding that there was a field price based on Utah Construction's sales.

■ Because there was a field price in Kaiser's marketing area, the District Court did not err in refusing to resort to Great Lakes prices to create representative prices for Kaiser's ore.

Kaiser argues that Great Lakes prices should nevertheless be taken into account with Utah Construction's prices, because the Great Lakes market exerts economic influence upon western prices and because Great Lakes prices are used for other purposes in pricing western transactions. Unquestionably the prices of ore, pig iron, and finished steel in the Great Lakes market have some influence on western steel and ore prices. But from that given it does not follow that there was error in rejecting Great Lakes transactions as directly relevant criteria in constructing Kaiser's gross income. The District Court was entitled to conclude that whatever had been the economic effect of Great Lakes transactions upon western prices was reflected in the prices that Japan and Kaiser actually paid Utah Construction for ore in 1949 and 1950.

■ We agree with Kaiser, however, that the District Court erred in including in the Utah Construction transactions used to compute field price, the 1950 sale to Geneva Steel Company and in failing to adjust the Utah sales to reflect the differences in freight charges between Utah's and Kaiser's mines and the target markets.

Utah Construction's sale to Geneva of 422,913.40 tons of ore at $1.29 per ton f.o.b. mine in 1950 should have been excluded from representative sales. That sale was of fine and soft ore, the accumulated detritus from sales to other customers. It was a distress sale of ore that was not similar to Kaiser's in grade or kind.

Kaiser is right in asserting error in the failure of the District Court to ad-just Utah Construction's prices to reflect the differences between the costs of transporting iron ore from Utah Construction's mine in Utah to the points of consumption and from Kaiser's California mines to the same points. In constructing Kaiser's gross mining income, we must assume that both Kaiser and Utah Construction are independent miners freely competing with one another for the customers in their marketing area. Since those customers are both in California, Kaiser at Fontana and Japan at Long Beach, Kaiser the miner has a competitive advantage in operating mines closer to the customers with lesser freight charges than Utah Construction has to pay.

The significance of the freight differentials is illustrated by one of the Government's own exhibits in which the value of Iron Springs ore is compared with that of Eagle Mountain ore. In the exhibit, an f.o.b. Utah price of $2.36 is adjusted by adding freight charges of $3.23 to Fontana and subtracting a freight charge of $1.73 from Eagle Mountain to Fontana. The resulting base f.o.b. price at Eagle Mountain was $3.86.

Recently promulgated Treasury Regulations accept the concept of adjusting market prices for differing transportation costs to compute field price.[1] The new Regulations are not strictly controlling because they had not been promulgated during 1949 and 1950. They are nevertheless highly persuasive because they represent a crystallization of administrative interpretation of a statute which has remained unchanged from 1949 to date.

1. Treas.Reg. 1.613–3(e) (2): " * * * [I]f other producers in the taxpayer's marketing area sell significant quantities of the ore or mineral of like kind and grade after the application of only mining processes but after purchased transportation to the customer * * * the delivered price at which the ore or mineral is sold by such other producers (if otherwise representative) reduced by the costs of purchased transportation to the customer paid or incurred by such producers shall be used by the taxpayer as the representative market or field price for his ore or mineral. *When applying the preceding sentence, appropriate adjustments shall be made to take into account differences in mode of transportation and distance.*" (Emphasis added.)

The court's findings determining Kaiser's f.o.b. mine price from Utah Construction's f.o.b. Iron Springs price without allowing for freight differentials were clearly erroneous.

■ Upon the facts of this case, we think a fair method of making an appropriate transportation adjustment is as follows:

A = average difference between the freight rates per ton of ore shipped from Iron Springs to Fontana and from Kaiser's California mines to Fontana.

B = average difference between the freight rates per ton of ore shipped from Iron Springs to Long Beach and from Kaiser's California mines to Long Beach.

C = total amount of ore delivered to Fontana by Kaiser and by Utah Construction.

D = total amount of ore delivered to Long Beach for export by Utah Construction.

E = weighted average f.o.b. mine price of Utah Construction's sales.

F = representative field price for Kaiser's ore.

The formula is: $F = E + [(\dfrac{C}{C+D} \times A) + (\dfrac{D}{C+D} \times B)]$.

---

### Coking Coal

Coke used in manufacturing western steel is a blend of a large portion of high volatile coking coal with a small portion of low volatile coal. High volatile coking coal deposits are very rare in the western states. During 1949 and 1950 major fields of high volatile coking coal were found only at Sunnyside, Utah, and at the Raton Mesa in southern Colorado and northern New Mexico. Low volatile coking coal was mined in quantity in the Oklahoma-Arkansas regions.

High volatile coking coal can be and is used for noncoking purposes, such as fuel for generating steam and for domestic purposes, but it is less well suited for these "commercial" uses than is noncoking coal.

In 1949 there were two coking coal mines side by side at Sunnyside, Utah. One belonged to Kaiser and the other to Utah Fuel Company. In 1950 Kaiser bought all of Utah Fuel Company's common stock.

In 1949 and 1950, respectively, Kaiser produced 416,615 and 591,568 net tons of coking coal at Sunnyside. It con-sumed most of that coal in its Fontana steel plant, but it did sell for commercial purposes to independent buyers about 25,000 net tons of coal at an average price of $5.01 per ton in 1949 and about 28,340 net tons at an average price of $4.89 per ton in 1950. During 1949 and early 1950, while operating independently, Utah Fuel Company sold 334,378 net tons of coking coal to various commercial and coking coal users, including Kaiser, for average prices of $4.79 per ton and $4.50 per ton in 1949 and 1950, respectively.

In 1949 Raton Mesa producers sold 441,253 net tons at an average price of $5.24 per ton and in 1950, 515,278 tons at $5.43 per ton. Raton Mesa sales were for commercial and coking coal purposes. The only major buyer of Raton Mesa coking coal for steel manufacture was Colorado Fuel and Iron Corporation, located in Pueblo, Colorado; but Raton Mesa producers sold some coking coal to Kaiser, and there was evidence that the freight rates for coking coal from Raton Mesa to Fontana were no greater than the rates from Sunnyside, Utah, to Fontana.

The. District Court found that Raton Mesa coal and Sunnyside coal competed in the same market and both were suitable for coking and were similarly utilized.

In its original returns for 1949 and 1950 Kaiser computed depletion using, respectively field prices of $5.015 per ton and $4.88 per ton, less certain royalties. In its amended returns it raised the prices to $9.90 per ton and $8.85 per ton in the successive years, again less royalties.

The District Court found field prices of $4.75 for 1949 and $4.87 for 1950, in each instance less royalties. Those prices yielded lower depletion allowances for coking coal than those permitted Kaiser on its original returns. The District Court's field prices were the result of a weighted average of f.o.b. mine prices of the sales of Sunnyside coal by Utah Fuel Company, to Kaiser and to commercial users and by Kaiser to commercial users.

To achieve a substantial increase in the field price of coking coal Kaiser seeks to limit the relevant sales to those from Raton Mesa producers to Colorado Fuel and Iron, flavored with pinches of high priced low volatile coal from Oklahoma and Arkansas. Kaiser contends that the District Court erred (1) in basing field price on Sunnyside sales, (2) in including any sales for noncoking purposes, (3) in failing to use Raton Mesa prices adjusted for washing and ash content, and (4) in failing to include Oklahoma-Arkansas coal sales.

We dispose of the last contention first, because it requires the least discussion. The District Court found that low volatile coal is not a mineral product of "like kind and grade" as that of Kaiser's coal. The finding is correct, and the court properly refused to take Oklahoma-Arkansas coal sales into account in ascertaining Kaiser's field price.

Kaiser's first position is that all sales of coking coal for noncoking uses should be eliminated. Kaiser's theory is that the coking coal market should be defined in terms of sales of coal for coking purposes, because coking coal used for coking has a unique value whereas coking coal used for other purposes is inferior to substitute products and its value diminishes accordingly. This end-use argument has been emphatically rejected in other cases involving coking coal. (Alabama By-Products Corp. v. Patterson (5th Cir. 1958) 258 F.2d 892; United States Pipe & Foundry Co. v. Patterson (N.D.Ala.1962) 203 F.Supp. 335, 346–347). Assuming, *arguendo*, that there may be circumstances in which the end use of a mineral product is relevant in determining field price of the product,[2] no such circumstances here exist. Although Raton Mesa prices to coking users are somewhat higher than prices to commercial users, the difference is not enough to compel a conclusion that the coking and commercial users comprised separate markets. The District Court's finding that there was a single market is not clearly erroneous.

The second step in Kaiser's market reducing plan is the elimination of Utah Fuel's sales on the ground that all of them were "sales made under peculiar economic circumstances and, in effect, distress sales" and to eliminate its own sales as "accommodation transfers made at cost."

Utah Fuel's sales cannot be described as distress sales. Utah Fuel conducted its Sunnyside mining operations for more than twenty years. During most of that time, Utah Fuel's mining business showed a profit, even after allocating fixed costs and overhead to that phase of its activities. It reported a profit from its total business every year, and it was not under compulsion to sell coal at a loss. The idea that Utah Fuel was sacrificing its coal for two decades borders on the

2. Henderson Clay Products v. United States (5th Cir. 1967) 377 F.2d 349; Woodville Lime Products Co. v. United States (N.D.Ohio 1966) 263 F.Supp. 311, 321–322; North Carolina Granite Corp. (1964) 43 T.C. 149, 158–159.

**342**

fanciful. When it comes to its 1949 business, Utah Fuel made a clear profit of 11 cents per ton on its sales of coking coal.

 Neither Utah Fuel's nor Kaiser's sales can be extracted from the relevant market data on the ground that the sales were not profitable or that they were not as profitable as they would have been under different market conditions. The existence of a representative field price does not turn on how profitable the sales may be. It is true that a market may disappear altogether if producers continually lose money, but so long as there are producers in the market in open competition, a market there will be. The District Court found that the Sunnyside prices resulted from free and open competition, and the sales were arm's length transactions. Those findings are fully supported by the evidence.

Upon losing its Sunnyside excision argument, Kaiser retreats to the position that there was clear error in the District Court's omission of Raton Mesa sales from its final arithmetic. Kaiser reaches us here.

The District Court did not reject the Ranton Mesa sales altogether. It used those sales to test the reliability of Sunnyside prices. We can discover no sound reason for thus restricting the use of Raton Mesa sales. Neither party challenges the findings that Raton Mesa producers competed with Sunnyside producers in the same market, that the coking coal of all the producers was of "like kind and grade," and that the coal was similarly utilized. The District Court's exclusion of Raton Mesa sales from the weighted averages used to compute field price is no more justified than was Kaiser's argument that sales for noncoking purposes should be excluded from the computation.

We reject Kaiser's claim, however, that Raton Mesa prices should be adjusted before they are included in the weighted averages to reflect differences in quality between Raton Mesa and Sunnyside coal. Whatever may be validity of Kaiser's theory of "commercial price adjustments" in another context, that theory is not applicable on this record. The District Court's detailed findings about the advantages and disadvantages of the respective coking coals are not clearly erroneous. Its penultimate finding that the advantages and disadvantages offset one another is likewise adequately supported by the evidence and is not flawed by any misassumption of law.[3]

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs.

---

3. Kaiser argues, for example, that the District Court failed to take into account that Sunnyside coal was washed and Raton Mesa coal was not. The washed-versus-unwashed contention does not aid Kaiser. The principal function of washing is to remove ash from the coal. The District Court clearly credited Sunnyside coal with a lower ash content than Raton Mesa coal.