WARNER COMPANY, Appellant
in No. 73–1722,

v.

UNITED STATES of America, Appellant
in No. 73–1723.

Nos. 73–1722, 73–1723.

United States Court of Appeals,
Third Circuit.

Argued April 4, 1974.

Decided Sept. 27, 1974.

690

Jules I. Whitman, Peter J. Picotte, II, Philadelphia, Pa., for Warner Co.; Dilworth, Paxson, Kalish, Levy & Coleman, of counsel.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, Donald H. Olson, Tax Div. Dept. of Justice, Washington, D. C., for the United States; Robert E. J. Curran, U. S. Atty., of counsel.

Before VAN DUSEN, WEIS and GARTH, Circuit Judges.

OPINION OF THE COURT

GARTH, Circuit Judge.

Warner Company (Warner) brought this action for a refund of federal income taxes alleged to have been erroneously paid for the taxable years 1956 through 1959 and 1961.[1] From a judgment in favor of the taxpayer, the Government appeals.[2] The issue presented

---

1. Jurisdiction existed in the district court under 28 U.S.C. § 1346(a)(1). Our jurisdiction exists by virtue of 28 U.S.C. § 1291.

2. Warner Company filed a cross-appeal, No. 73–1722, asserting that in the event a repre-

sentative market or field price is found to exist, that price should be adjusted by the cost of transportation of limestone to Bellefonte. We treat this issue at page 698, infra.

is whether Warner is entitled to employ the "proportionate profits" method of computing its percentage depletion allowance of limestone. The resolution of that issue depends upon whether a "representative market or field price" existed for Warner's limestone.

■■■ The district court concluded that "there [was] no representative field or market price for kilnstone [limestone] produced by Warner Company at Bellefonte, during the years involved. It follows, therefore, that plaintiff, Warner Company, must compute its depletion base, 'gross income from the property' for its Bellefonte mine, by reference to the proportionate profits method of computation." [3]

We disagree with the district court, and reverse.[4]

### I.

■■■ Under 26 U.S.C. §§ 611 and 613,[5] taxpayer claims it is entitled to a percentage depletion allowance of its gross income from mining its limestone. The regulations promulgated thereunder provide, among other things, that if the mined product is processed (as this limestone was processed into calcined lime) before it is sold by the taxpayer, the gross income from the mining of the mineral is to be constructively computed.[6] Under Treasury Regulation

3. The determination of a representative market or field price is one of fact, Ames v. United States, 330 F.2d 770 (9th Cir. 1964), subject to the clearly erroneous standard. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Applying that standard, we conclude that the district court erred.

4. In an action for a refund of federal income taxes allegedly erroneously paid, the burden is upon the taxpayer to prove that a representative market or field price does not exist. Alabama By-Products Corp. v. Patterson, 258 F.2d 892 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959). Warner failed to discharge its burden of proving by a fair preponderance of the evidence that there was no representative market or field price of limestone of like kind and grade.

5. 26 U.S.C. §§ 611 and 613 provide in pertinent part:
Sec. 611. *Allowance of deduction for depletion.*
   (a) *General rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. . . .

Sec. 613. *Percentage depletion.*
   (a) *General rule.*—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section·611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). . . .

   (c) *Definition of gross income from property.*—For purposes of this section—
   (1) *Gross income from the property.*— The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.
   (2) [as amended by Sec. 302(b)(1), Public Debt and Tax Rate Extension Act of 1960, P.L. 86–564, 74 Stat. 290] *Mining.*—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

6. Constructive gross mining income is the amount which would have been earned if the miner-manufacturer were "disintegrated" and the raw materials were sold by its min-

§ 1.613–4,[7] this is to be accomplished by determining the "representative market or field price" as of the date of the taxpayer's sale of the processed product, of a mineral of like kind and grade, if there is such a representative market or field price. This regulation further provides that if there is no such representative market or field price, the gross income is to be computed by what is commonly called the proportionate profits method.[8] The regulation, however, does not permit the taxpayer to browse freely through these various methods and select the one most favorable to it. The representative market or field price method is the only one available unless the taxpayer establishes that there is no such price. *Ames, supra.* Only then is the proportionate profits method available to it. If a representative market or field price is established and it is less than the taxpayer's mining costs, no deduction is allowed. United States v. Cannelton Sewer Pipe Co., *supra.* This is so because 26 U.S.C. § 613(a) expressly limits the percentage depletion allowance to a maximum of 50% of the taxpayer's taxable income from mining. If costs are higher than the selling price, there can be no income. Without income, there can be no depletion allowance under this section of the statute.

## II.

The district court's findings of fact reveal the following. During the years in question, taxpayer, a Delaware corporation, was an integrated miner-manufacturer of limestone into lime with facilities located at Bellefonte, Pennsylvania. Virtually all of the limestone, the mined product, that taxpayer mined was converted by it to lime. Limestone has two very broad types of uses. One is for the physical functions that the limestone performs and the second is for its chemical properties. The latter limestone, kilnstone or fluxing stone,[9] is used both in the lime producing industry and in the steel industry and is the type of limestone mined by taxpayer. It is a high quality, high calcium grade of limestone having a calcium carbonate content of 97.8%

In extracting limestone from its mine, taxpayer employed the relatively expensive stope method of mining.[10] As a result, it incurred mining costs in excess of $2.00 per ton. Employing this method, during the years in question, taxpayer extracted between 387,794 and 569,914 net tons of limestone each year. Of these, between 293,794 and 439,572 net tons of limestone were consumed in its lime kilns each year. Although taxpayer's business was selling lime, it did sell small amounts of raw limestone. The price at which these sales were made was $2.00 per ton and they were accommodation sales made to obtain the good will of the purchasers.

During the period 1956 to 1961, National Gypsum Company and Standard Lime and Cement Company were taxpayer's principal competitors in the production of lime in the Bellefonte area and, like taxpayer, were integrated miner-manufacturers. Both of these companies mined the same kind and grade of limestone as taxpayer and incurred mining costs approximating taxpayer's.

ing division as a separate entity. United States v. Cannelton Sewer Pipe Co., 364 U. S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960).

7. Appendix I sets out the pertinent provisions of the Treasury Regulation.

8. Regulation § 1.613–4 also provides that if the taxpayer establishes to the satisfaction of the commissioner that another method of computation, other than the computation of profits, proportionate to costs, clearly reflects the gross income from the property then such method of computation may be employed.

9. This stone is also called "open hearth" stone or "blast furnace" stone.

10. The stope method of mining for the extraction of ore is an underground steplike excavation carried on either above or below the level where the mass of ore is broken in successive layers. *See* Creede United Mines Co. v. Hawman, 23 Colo.App. 125, 127 P. 924, 926 (1912); Webster's Third New International Dictionary 2251 (1966).

National Gypsum sold no raw limestone although a potential market for its limestone did exist at Pittsburgh (Finding No. 32); Standard Lime made annual sales of stone to various steel companies approximating 10,000 to 15,000 net tons per year at an f. o. b. quarry price of $1.75 per ton. Although these were accommodation sales, the district court specifically found that the "accommodation nature of these sales had no bearing on the price charged, and Standard Lime priced this flux stone so that it was delivered at a competitive price". (Finding No. 41)

In addition to the above two companies, two other companies produced limestone in the Bellefonte area, Whiterock Quarries and Valley View Lime Company (also referred to as Valley View Quarries). Both of these companies produced the same quality limestone as the integrated miner-manufacturers; however, they sold their limestone on the open market, largely to steel companies in Pittsburgh and Youngstown, Ohio, at prices ranging from $1.55 to $1.74 per ton. During the years in question, neither of these companies sold any limestone to the three Bellefonte lime producers. Whiterock and Valley View, during these years, produced a total of about 515,108 tons of limestone as compared to approximately 7,019,485 tons produced by the three integrated miner-manufacturers. Over the six-year period, the total amount of tons of high quality, high calcium stone produced by Whiterock and Valley View was 7.3% of the total net tonnage of kilnstone produced by taxpayer, National Gypsum and Stand-

ard Lime. However, with regard to taxpayer alone, the total production of Whiterock and Valley View averaged 25.-7% of the kilnstone produced by taxpayer. (Findings Nos. 47, 48, 49, 52, 55–57).

Bellefonte is located in the center of a high-calcium limestone producing area stretching from Virginia and West Virginia to the south, to other limestone deposits in Pennsylvania and to deposits near Lake Erie in Michigan. At least five producers of limestone of like kind and grade to that of taxpayer's sold vast quantities of blast and open hearth stone to steel producing and lime-making companies in Pittsburgh, Johnstown and Bethlehem, Pennsylvania.[11] This is the same market in which both Whiterock and Valley View competed. These sales, f. o. b. mine or quarry, ranged from $1.-46 to $1.85 per net ton and for sales from Michigan, they varied from $.85 to $.94 per net ton.[12] No sales were found at or above $2.00 per ton.[13]

### III.

The district court's determination that no representative market or field price existed for Warner's limestone was based on (1) Warner's unwillingness to sell its stone in the limestone market as it could not do so profitably, (2) Warner's status as an integrated miner-manufacturer, and (3) Warner's "unique" situation geographically. While each of these factors may be important to the manner in which Warner conducts its business, factors (1) and (2) are not to be taken into account in determining whether a representative market or field

---

11. Findings of Fact Nos. 60 and 61 are as follows:

   60. The principal areas of high calcium limestone consumption in Pennsylvania, Virginia and West Virginia during the years involved were Pittsburgh, Pennsylvania, Bellefonte, Pennsylvania and Bethlehem, Pennsylvania.

   61. Various companies producing high calcium limestone in the Virginia Valley area sold principally to steel companies in the greater Pittsburgh district. High calcium limestone producers located at or near Annville, Pennsylvania, sold their

limestone eastward to steel companies located in Eastern Pennsylvania, principally Bethlehem.

12. Neither the government nor the district court considered the Michigan sales in determining whether a representative market or field price existed because these sales were substantially lower in price and deemed unrepresentative.

13. See Appendix II for district court Findings of Fact 64–68 inclusive bearing on sales prices.

price exists, and the third factor relied on by the district court, while relevant, cannot standing alone support the determination reached.

## A. Profitability

The district court concluded that the representative market or field price, if there was one, would have to be determined by looking at Bellefonte only, reasoning that:

[B]ecause the direct and indirect mining costs for Warner Mining Company were over $2.00 per ton, Warner Mining Company would not attempt to sell its stone to the Pittsburgh and Eastern Pennsylvania (Bethlehem) market areas assuming it could only obtain a maximum price, f. o. b. Bellefonte, of $1.76 or less per ton, nor would it attempt to sell stone to Warner Manufacturing Company at such price. . . .

This court is of the opinion that the market or field price must exist at Bellefonte if it exists at all and that prices from other markets are not relevant to establish the existence of a price at Bellefonte.

Bellefonte is a distinct limestone field area and market which exists as a lime producing center and not as a limestone-fluxstone producing center . . . . To establish a representative market or field price for Warner's limestone, we must limit the market to one in which the *taxpayer would have and could have competed* in order to obtain a price which is in fact representative. . . . The "market" or "field" concept is an economic concept which necessarily assumes the presence of actual competition. (emphasis supplied)

The district court's reasoning and conclusion are at odds with the Supreme Court's decision in United States v. Cannelton Sewer Pipe Co., *supra*.

In *Cannelton* the Supreme Court specifically disapproved of the use of the profitability test in determining depletion allowances stating:

This indicates that fire clay and shale were "commercially marketable" in their raw state *unless that phrase also implies marketability at a profit. We believe it does not.* Proof of these sales is significant not because it reveals an ability to sell profitably— which the respondent could not do— but because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption—in short, they have passed the "mining" state on which the depletion principle operates. It would be strange, indeed, to ascribe to the Congress an intent to permit each miner to adopt processes peculiar to his individual operation. *Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high-cost mine operator. The value of respondent's vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals.*

Respondent insists that its miner-manufacturer status makes some difference. We think not. It is true that the integrated miners in Indiana outnumbered the nonintegrated ones. But in each of the three basic percentage depletion Acts the Congress indicated that the integrated operators should not receive preferred treatment. Furthermore, in Regulations 77, discussed above, the Treasury specifically provided that depletion was allowable only on the crude mineral product. And, as we have said, this regulation was substantially enacted into the 1943 Act. We need not tarry to deal with any differences which are said to have existed in administrative interpretation, for here we have authoritative congressional action itself. Ever since the first per-

centage depletion statute, the cut-off point where "gross income from mining" stopped has been the same, i. e., where the ordinary miner shipped the product of his mine. *Respondent's formula would not only give it a preference over the ordinary nonintegrated miner, but also would grant it a decided competitive advantage over its nonintegrated manufacturer competitor. Congress never intended that depletion create such a discriminatory situation.* As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned. (emphasis supplied)

364 U.S. at 86–87, and *see* 89 n. 10, 80 S.Ct. at 1586. The Supreme Court stressed that depletion was designed not to compensate for costs of recovery but for exhaustion of mineral assets alone. *See also* Kaiser Steel Corp. v. United States, 411 F.2d 335 (9th Cir. 1969); Dravo Corp. v. United States, 348 F.2d 542, 172 Ct.Cl. 200 (1965); Virginia Greenstone Co. v. United States, 308 F.2d 669 (4th Cir. 1962); United States v. Henderson Clay Products, 324 F.2d 7 (5th Cir. 1963); Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9th Cir. 1961); and United States v. Pacific Clay Products, 285 F.2d 215 (9th Cir. 1960). Thus, the district court here erred in considering profitability as a factor in the determination of a representative market or field price. As the court in *Kaiser Steel Corp., supra,* noted:

> Neither Utah Fuel's nor Kaiser's sales can be extracted from the relevant market data on the ground that the sales were not profitable or that they were not as profitable as they would have been under different market conditions. The existence of a representative field price does not turn on how profitable the sales may be. It is true that a market may disappear altogether if producers continually lose money, but so long as there

are producers in the market in open competition, a market there will be. 411 F.2d at 342. *See also* Shamrock Oil & Gas Corp., 35 T.C. 979 (1961).

B. Integrated Miner-Manufacturer

The district court assigned substantial weight to Warner's status as an integrated miner-manufacturer as its second factor in the determination of the area in which the market or field price must exist. It held that:

> [T]he market area of an integrated miner-manufacturer, such as Warner Company, is the area in which it extracts and converts its mineral into its manufactured product. (Conclusion of Law No. 9)

We disagree.

To adopt such a broad principle as enunciated by the district court would permit integrated miner-manufacturers to establish by their own acts in the location of their facilities the existence of a representative market or field price. If we were to subscribe to the district court's reasoning, all that would be required to avoid using the representative market or field price method would be to establish an integrated mining-manufacturing plant slightly apart from others and consume all of the raw material produced there. *Cannelton's* teachings dictate against the adoption of such a principle.

While an integrated miner-manufacturer should be regarded as if the mining half were selling to the manufacturing half,[14] this does not mean that the price at which the mining half would sell the raw product to the manufacturing half is controlling. Rather, the standard for determining whether a representative market or field price exists is that of actual competitive sales. The test to be employed is whether or not there have been recent, substantial sales of limestone similar to taxpayer's in quality and availability to market, and, if so, at what price were those sales made. Phillips Petroleum Co. v. Byn-

14. United States v. Cannelton Sewer Pipe Co., *supra.*

um, 155 F.2d 196, 198 (5th Cir. 1946).[15] Restated, the inquiry is the price a consumer would pay for the raw mineral mined by the mining "half". It is not what the manufacturing "half" would pay for the comparable raw mineral.

> The proper gross income is that which the hypothetical mining entity would realize upon selling its products to its processing alter-ego. The need for this constructive disintegration is emphasized by the strong desire to afford no unfair tax advantage to the integrated producer vis-a-vis the non-integrated miners and manufacturers. *The representative price is then the competitive going price for the product, i. e., the price charged by the taxpayer's competitors.* (emphasis added)

United States v. Henderson Clay Products, 324 F.2d 7, 15 (5th Cir. 1963).

### C. Geographic Factor

In its discussion, the district court stated that Bellefonte is a distinct market "which exists as a lime producing center and not as a limestone-fluxstone producing center." Further, the district court found as a fact that the target market for any limestone mined by Warner could only be Bellefonte because Bellefonte was the "site of its [Warner's] manufacturing facilities." (Findings Nos. 75, 76).

Reviewing these findings, the district court clearly erred. It is irrelevant whether Bellefonte exists as a *lime* producing center. The relevant inquiry, (*see Cannelton, supra*), is whether a representative market or field price for a mined product (in this case, *limestone*) exists. As such, the question is whether there exists a substantial market in which taxpayer, had it been solely engaged in mining, could have sold its raw limestone. Our inquiry then *cannot* be limited solely to the geographic locale of the *manufacturing* facilities of the

integrated miner-manufacturer as the district court found. In *Cannelton, supra,* the Supreme Court found a relevant market approximately 140 miles from the site of the integrated miner-manufacturer. In *Kaiser Steel Corp., supra,* the court considered the entire western part of the United States. In Virginia Greenstone Company v. United States, *supra,* the court considered the entire state of Virginia and part of Kentucky. *See also* Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 187 Ct.Cl. 129 (1969); Hugoton Production Co. v. United States, 349 F.2d 418, 172 Ct.Cl. 444 (1965). One circuit has approved a representative market and field price which was determined by reference to the industry wide grading and pricing system:

> [T]he district court found that the taxpayer could properly rely on the industry-wide grading and pricing system to establish representative prices for the limestone shipped to its mills.
>
> . . .
>
> \* \* \* \* \* \*
>
> Thus the courts have allowed neither physical characteristics nor end use nor conditions of marketing to narrow the class of products to be used in reaching comparative prices. The district court was correct in finding the existence of a well-established representative market or field price for taxpayer's rough block limestone.

Bloomington Limestone Corp. v. United States, 445 F.2d 1105, 1107, 1108 (7th Cir. 1971).

Thus, we hold that the district court erred in restricting its inquiry as to "market" to Warner's manufacturing situs and Bellefonte.

### IV.

Contrary to the district court's conclusion, our review of that court's Findings of Fact and discussion demonstrates that there did exist a representative

---

15. *See* Appendix I, Treas.Reg. § 1.613–4(c)(3) for those factors to be considered in determining the existence of a representative market or field price.

market or field price.[16] Indeed, in the instant case, the district court found that a market for limestone of like kind and grade as taxpayer's limestone existed at Pittsburgh (which is approximately 130 miles from taxpayer) and other areas adjacent to Bellefonte.[17] The district court failed to give appropriate significance to this finding, because of the undue weight given to taxpayer's unwillingness to participate in such a market absent assurances of profitability in sales (see III A. *supra*) and to taxpayer's status as an integrated miner-manufacturer (see III B. *supra*).

Expanding our examination of "market" beyond the boundaries of Bellefonte, we note that no price for limestone was found by the district court at or above the price of $2.00 per ton in the relevant market, including the greater Pittsburgh area. While the sales of raw limestone f. o. b. Bellefonte, were small in comparison to the total amount mined and consumed in Bellefonte by Warner, nevertheless they were made at competitive prices ($1.55–$1.75). The district court specifically found in the case of Standard Lime which had made accommodation sales to its good customers, that

\*   \*   \*   \*   \*   \*

. . . 41. The accommodation nature of these sales had no bearing on the price charged, and Standard Lime priced this fluxstone so that it was delivered at a competitive price.

Although the district court described the Valley View and Whiterock production as being insignificant, the combined production of Valley View and Whiterock, when compared to the taxpayer's production of limestone during 1956–1961, averaged 25.7% of Warner's production. Moreover, these sales were made at a price (Whiterock $1.61–$1.74; Valley View $1.55–$1.60) in the range of the price charged by Standard Lime ($1.75) which latter price the district court found to be competitive.[18]

The district court in its discussion recognized that there was a market

16. In normal course our holding that the district court erred in not finding a representative market or field price would generally require a remand to the district court for a determination of what that representative market or field price is. We need not remand here in light of the record and the issue presented to us. We are concerned only with the question of representative market or field price as it relates to the depletion allowance. As previously noted, depletion allowance is permitted only from income, i. e., when the sales price exceeds cost (of mining). The district court's Findings of Fact demonstrate beyond question that not only did Warner's costs exceed any competitive price it could have received from the sale of its limestone, but Findings Nos. 80 and 81 recite that Warner would not sell any of its limestone at less than its cost of $2.00 per ton. The district court has made Findings of Fact (which it ignored in formulating its conclusion) as to competitive sales prices of limestone in the greater Pittsburgh area and elsewhere, and in each instance the price was below $2.00. (Finding of Fact No. 81 assumes a maximum price f. o. b. Bellefonte of $1.76 or less per ton). There being no possibility of any depletion allowance available to Warner within a relevant market (i.e., a market not restricted to Bellefonte) based on a $2.00 cost, on this record, we find it unnecessary to remand.

17. Valley View, Whiterock and Standard Lime, all located in Bellefonte, sold raw limestone in Pittsburgh and adjacent areas, as did limestone producers located in West Virginia, Virginia, Michigan and other areas in Pennsylvania.

18. We recognize the distinction made in the regulations with respect to accommodation sales. Yet, as we note in the text, the district court found that the accommodation nature of the sales did not prevent consideration of them for market price purposes. As was stated in Alabama By-Products Corp. v. Patterson, 258 F.2d 892, 899 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S. Ct. 318, 3 L.Ed.2d 303 (1959):

Although the sales made by the taxpayer were in the nature of "forced" sales owing to peculiar economic conditions, the sales of coking coal by the other companies were the natural result of competitive bargaining, and principles of supply and demand. This is enough to create a true market in commerce. (footnotes omitted)

See also, Ames, supra; Riverton Lime and Stone Co. v. C.I.R., 28 T.C. 446 (1957) (where the court allowed a sales price in a restricted number of sales to stand as a representative market or field price).

for limestone at Pittsburgh, at Bethlehem, at Chicago, at Detroit and "all over" the United States, but not for Warner's limestone. It reasoned that Warner could have sold its limestone anywhere but only if Warner's price was competitive. The difficulty with this reasoning is that Warner's profit desires may not legitimately be considered in the context of determining a representative market or field price or in determining depletion allowance. *See* United States v. Cannelton Sewer Pipe Co., *supra*, 364 U.S. at 86–87, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

■ At the outset, we noted that Warner had the burden of proving that no representative market or field price existed. Inasmuch as we reject Warner's theories (1) that profitability must be present in determining the representative market or field price, and (2) that Warner should be accorded a unique status as a miner-manufacturer within a "market" restricted to Bellefonte alone, we can discern no other basis on which Warner has met its requisite burden.

We hold, therefore, that a representative market or field price existed in at least the greater Pittsburgh area, including Bellefonte, for the years involved, and that Warner has failed to carry its burden to prove otherwise.

■ Warner alternatively urges in its cross appeal that if a representative market or field price exists (as we hold that it does), that adjustments should be made for freight costs. Warner states this position as:

[I]f it is established that any of the prices of the fluxstone produced outside the Bellefonte area and sold to certain consumption areas outside the Bellefonte area establish a basis for the determination of a field or market price . . . for Warner's kilnstone, then, to establish a representative field or market price for Warner's kilnstone mined and used at Bellefonte, such unadjusted price must be adjusted by increasing it by the freight differential which would exist due to the additional cost of shipment from such other producing area to Bellefonte.

Brief for Warner in No. 73–1723 at 32.

Having considered the arguments advanced by Warner in support of its position, we find them without merit.[19]

19. Although this issue was raised in the district court, that court's finding (that no representative market or field price existed) obviated any necessity for that court to rule on Warner's alternative argument. Our holding, reversing the district court on the ground that a representative market or field price did exist, obliges us to consider Warner's alternative contention. Warner's argument is predicated upon the assumption that "[O]nce it is assumed that Bellefonte is Warner's marketing area, then if Virginia Valley [a limestone producing area] is used in the determination of a representative field or market price [sic] it is necessary under the *Kaiser* case [411 F.2d 835 (9th Cir. 1969)] to adjust for freight differentials to Bellefonte." Reply Brief for Warner in No. 73–1722 at 2. Warner's argument founders on the assumption that Bellefonte is Warner's marketing area. Once it is determined that Warner's marketing area cannot be confined to Bellefonte, the argument falls of its own weight. As we have stated, we are concerned here with the price at which Warner's mining "half" could have sold its limestone. We are not concerned with the price that Warner's manufacturing "half" would pay for limestone, whether that limestone was purchased in Bellefonte or purchased from other producing areas and then shipped to Bellefonte. (In this connection, we note that Exhibits P–2 and P–4 demonstrate little disparity in freight rates *from* Bellefonte and other producing areas to *Pittsburgh*).

Warner's reliance upon *Kaiser, supra,* is necessarily misplaced. *Kaiser* interpreted regulations not at issue here and the court in *Kaiser* was concerned with an integrated miner-manufacturer having its mining and manufacturing facilities geographically separated. The circumstances giving rise to freight cost consideration in *Kaiser* are not present here.

The judgment of the district court will be reversed and the case remanded with the direction that the district court enter judgment for the defendant United States in accordance with the foregoing opinion.

Costs to be borne by each party in No. 73–1723; costs to be taxed against cross-appellant Warner in No. 73–1722.

## APPENDIX I.

Regulation § 1.613–4 in pertinent part provides:

§ 1.613–4  *Gross income from the property in the case of minerals other than oil and gas.*

.     .     .     .     .     .

(c) *Cases where a representative market or field price for the taxpayer's ore or mineral can be ascertained—*

(1) *General rule.* If the taxpayer processes the ore or mineral before sale by the application of nonmining processes (including nonmining transportation), or uses it in his operations, gross income from mining shall be computed by use of the representative market or field price of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes actually applied (if any), including mining transportation (if any), and before any nonmining transportation, subject to any adjustments required by paragraph (e)(1) of this section. See paragraph (e)(2)(i) of this section for certain other situations in which this paragraph shall apply. The objective in computing gross income from mining by the representative market or field price method is to ascertain, on the basis of an analysis of actual competitive sales by the taxpayer or others, the dollar figure or amount which most nearly represents the approximate price at which the taxpayer, in light of market conditions, could have sold his ores or minerals if, prior to the application of nonmining processes, the taxpay-er had sold the quantities and types of ores and minerals to which he applied nonmining processes. If it is possible to determine a market or field price under the provisions of this paragraph, and if that price is determined to be representative, the taxpayer's gross income from mining shall be determined on the basis of that price and not under the provisions of paragraph (d) of this section. The taxpayer's own actual sales prices for ores or minerals of like kind and grade shall be taken into account when establishing market or field prices, provided that those sales are determined to be representative.

.     .     .     .     .     .

(3) *Factors to be considered in determining the representative market or field price for the taxpayer's ore or mineral.* In determining the representative market or field price for the taxpayer's ore or mineral, consideration shall be given only to prices, ores or minerals of like kind and grade as the taxpayer's ore or mineral and with which, under commercially accepted standards, the taxpayer's ore or mineral would be considered to be in competition if it were sold under the conditions described in paragraph (b)(1) of this section. A weighted average of the competitive selling prices of ores or minerals of like kind and grade as the taxpayer's, beneficiated only by mining processes, if any, in the relevant markets, although not determinative of the representative market or field price, is an important factor in the determination of that price. The taxpayer's own competitive sales prices for minerals which have been subjected only to mining processes shall be taken into account in computing such a weighted average. For purposes of the preceding sentence, if the district director has exercised his authority under section 482 and the regulations thereunder and has determined the appropriate price with respect to specific sales transactions by the taxpayer, that price shall be deemed to be a competitive sales price for those transactions. Sales or purchases, includ-

ing the taxpayer's of ores or minerals of like kind and grade as the taxpayer's, will be taken into consideration in determining the representative market or field price for the taxpayer's ore or mineral only if those sales or purchases are the result of competitive transactions. The identity of the taxpayer's relevant markets (including their accessibility to the taxpayer), and the representative market or field price within those markets, are necessarily factual determinations to be made on the basis of the facts and circumstances of each individual case. For the purpose of determining the representative market or field price for the taxpayer's ore or mineral, exceptional, insignificant, unusual, tie-in, or accommodation sales shall be disregarded. Except as provided above, representative market or field prices shall not be determined by reference to prices established between members of a controlled group. See paragraph (j) of this section for the definitions of the terms "controlled" and "group".

.    .    .    .    .    .

(d) *Cases where a representative market or field price cannot be ascertained*—(1) *General rule.* (i) If it is impossible to determine a representative market or field price as described in paragraph (c) of this section then, except as provided in subdivision (ii) of this subparagraph, gross income from mining shall be computed by use of the proportionate profits method as set forth in subparagraph (4) of this paragraph.    .    .    .

.    .    .    .    .    .

(4) *Proportionate profits method.* (i) The objective of the "proportionate profits method" of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product or group of products (as defined in subdivision (iv) of this subparagraph) earns the same percentage of profit.    .    .    .

## APPENDIX II.

Among other Findings of Fact made by the district court, the following appear with respect to sales prices:

.    .    .    .    .

64. The J. E. Baker Company operated a quarry a few miles south of Martinsburg, West Virginia. During the years 1956 through 1961, the Company sold the following tonnages of open hearth, blast furnace and foundry stone for the prices indicated:

| Year | Net Tons Sold | Average f.o.b. quarry price (net ton) |
|------|------|------|
| 1956 | 180,518 | $1.68 |
| 1957 | 166,469 | 1.71 |
| 1958 | 152,420 | 1.74 |
| 1959 | 143,684 | 1.73 |
| 1960 | 110,053 | 1.74 |
| 1961 | 56,070 | 1.62 |

The vast majority of these tonnages were sold to steel mills in the Pittsburgh area, Youngstown and Weirton, West Virginia areas.    .    .    .

65. The W. S. Frey Company, Inc., operated a limestone quarry at Martinsburg, West Virginia, during the period January 1, 1956 to March of 1961. For the balance of 1961, the Company moved its operation to Clearbrook, West Virginia after selling its Martinsburg plant.

During each of the years 1956 through 1959, W. S. Frey Company sold approximately 150,000 net tons of open hearth limestone. Prices for these sales averaged $1.75 per net ton f. o. b. quarry. The majority of these sales were made to customers in the greater Pittsburgh area. During the years 1956–1959, the Company sold approximately 75,000 net tons of blast furnace stone annually. Prices for this product averaged $1.65 per net ton f. o. b. quarry. The majority of these sales were also made to customers in the greater Pittsburgh area.    .    .    .

During the year 1961, the Company sold some 275,000 net tons of open hearth stone and 84,000 net tons of blast

furnace stone. The average f. o. b. quarry price per (net) ton for the open hearth stone ranged from $1.47 to $1.74.

During 1961, the Company sold 9,493 net tons of kilnfeed to the Mercer Lime and Stone Company. The price per net ton was $1.65. This price was set by the Company to sell at the same price as the blast furnace stone price, which was ten cents per ton less than open hearth stone due to its smaller size. The kilnfeed sold to Mercer was 3″ x 5″ in size. Had Frey instead wanted to sell Mercer a kilnfeed sized ½″ x 2″ (which is in the middle of Warner's kilnfeed size spectrum), Frey's president stated that he would have set the price some five to ten cents less than the price of blast furnace stone and kilnfeed, which was $1.65.

The Company sold its open hearth and blast furnace stone to a variety of steel companies located in Pennsylvania, Maryland, Ohio and West Virginia. During the years in suit, the Company considered itself to be in competition for open hearth stone sales in the greater Pittsburgh area with the Valley View Quarries, Bellefonte, Pennsylvania, Thomasville Stone and Lime Company, and several other Virginia and West Virginia limestone operators.

66. The Chemstone Corporation operated a limestone quarry and lime plant in Strasburg, Virginia, during the years 1956–1961. . . .

The average price per (net) ton received by the Company for open hearth stone ranged from $1.54 to $1.74. The average blast furnace price varied from $1.34 to $1.85. The Company sold its open hearth and blast furnace stone to a large number of customers located in Pennsylvania, Maryland, Ohio, West Virginia, and Michigan.

67. The M. J. Grove Lime Company conducted two limestone operations in Virginia during the years 1956 through 1961—one at Middletown and the other at Stephens City. . . .

During these years, the following average f. o. b. quarry prices were received by the Company:

| Year | Product | f.o.b. quarry price (net ton) |
|---|---|---|
| 1956 | open hearth stone | $1.64–$1.65 |
| | blast furnace stone | |
| 1957 | open hearth stone | $1.73–$1.74 |
| | blast furnace stone | 1.53– 1.54 |
| | kilnfeed | 1.57– |
| 1958 | open hearth stone | $1.73–$1.74 |
| | blast furnace stone | 1.48– 1.54 |
| | chemical stone | 1.80 |
| 1959 | open hearth stone | $1.73–$1.74 |
| | blast furnace stone | 1.54 |
| | chemical stone | 1.80 |
| | kilnfeed | 1.57 |
| 1960 | open hearth stone | $1.65–$1.72 |
| | blast furnace stone | 1.63– 1.65 |
| | chemical stone | 1.80 |
| 1961 | open hearth stone | $1.70 |
| | blast furnace stone | 1.61–$1.65 |
| | kilnfeed | 1.61 |

. . . . . .

The Company's open hearth and blast furnace stone customers were located in the greater Pittsburgh area, and the areas of Wheeling, West Virginia; Bethlehem, Pennsylvania; and Maryland. . . .

68. During all of the years in suit the Mercer Lime and Stone Company (located in Branchton, Pennsylvania, some 50 miles north of Pittsburgh), operated four vertical lime kilns, which used a size 3″ x 5″ kilnfeed. . . . During the period in suit the tonnages purchased, and the f. o. b., hold of vessel, Port of Calcite, Rogers City prices, were as follows:

| Year | Net Tons Purchased | Average price per ton f.o.b., hold of vessel, Port of Calcite, Rogers City, Michigan |
|---|---|---|
| 1956 | 111,402 | $.85 |
| 1957 | 113,663 | .92 |
| 1958 | 125,787 | .94 |
| 1959 | 119,711 | .94 |
| 1960 | 154,102 | .94 |
| 1961 | 122,236 | .94 |

The chemical quality of this stone was practically identical to Warner's kilnfeed.